# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 12-2111
No. 12-2447

———————————————

National Labor Relations Board

*Petitioner*

v.

RELCO Locomotives, Inc.

*Respondent*

———————————————

No. 12-2203
No. 12-2503

———————————————

RELCO Locomotives, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

——————

Submitted: May 14, 2013
Filed: August 20, 2013

——————

Before WOLLMAN, MURPHY, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

In two separate National Labor Relations Board (NLRB) proceedings, RELCO Locomotives, Inc. (RELCO) was found to have unlawfully discharged a total of eight workers for engaging in protected labor activity. The NLRB ordered the workers reinstated and petitioned for enforcement of its orders. RELCO cross petitioned for review of each of the two orders. After the initial briefing was completed, RELCO raised a new issue challenging the Board's composition and claiming that several members had been appointed in violation of the recess appointments clause of the United States Constitution. We consolidated the cases for oral argument and now address both the labor law issues as well as RELCO's challenge to the recess appointments. Concluding that substantial evidence supports the Board's labor law conclusions and that we lack the authority to decide RELCO's challenge to the recess appointments, we grant the NLRB's application for enforcement and deny RELCO's petitions for review of the two NLRB orders.

I.

Before the court are two separate NLRB decisions, designated here as RELCO I and RELCO II, each of which concerned the termination of four different employees by the company. RELCO builds and refurbishes locomotives in a plant located in Albia, Iowa. RELCO's management includes Chief Executive Officer Mark Bachman, Chief Administrative Officer Doug Bachman (Mark's brother),[1] Operations Manager

_____

[1] While both CEO Mark Bachman and Chief Administrative Officer Doug Bachman are company officers, Mark was more involved in this case. References to "Bachman" alone refer to Mark. Where Doug Bachman appears, he is identified by both names.

David Crall, and Fabrication Supervisor Cliff Benboe, who together were responsible for most of the terminations at issue in this case. RELCO I involves the terminations of Jeffrey Smith, Ronald Dixon, Timothy Kraber, and Dana See, while RELCO II addresses the terminations of Mark Baugher, Charles Newton, Richard Pace, and Nicholas Renfrew.

Each evidentiary hearing before the Board was initially presided over by an Administrative Law Judge (ALJ).[2] Its general counsel represented the Board during the proceedings and RELCO was represented by its own counsel. In each of the cases the ALJ issued a comprehensive opinion concluding that the complainants had been terminated because of protected labor activity and ordering that each be reinstated and receive backpay. See National Labor Relations Act, 29 U.S.C. § 158(a). In RELCO I the ALJ also found that a nondisclosure agreement required by RELCO was unlawful and ordered it rescinded. The NLRB affirmed in both cases, without substantial comment in RELCO II and with only minor and immaterial modifications in RELCO I.[3] The factual circumstances surrounding each termination are discussed below.

A. RELCO I Evidentiary Hearing

*1. Jeffrey Smith*

Jeffrey Smith was a welder with RELCO from January 2008 until his termination in June 2009. In early 2009, Smith attempted to meet with RELCO CEO

---

[2] The Honorable William L. Schmidt presided over RELCO I, and the Honorable Geoffrey Carter presided over RELCO II.

[3] The NLRB panel in RELCO I consisted of Brian Hayes, Richard Griffin, and Sharon Block. The panel in RELCO II consisted of Mark Pearce, Richard Griffin, and Sharon Block. The validity of the appointments of members Griffin and Block, as well as that of Terence Flynn are challenged by RELCO. See infra Part II.

Mark Bachman to discuss the attendance system and a pay increase. After failing to arrange a face to face meeting, Smith composed a lengthy letter which he delivered to his supervisor to pass on to Bachman. In March 2009, Smith discovered a labor union insignia for the Brotherhood of Railroad Signalmen (BRS) on a train he was repairing. He wrote an email inquiring about representation, and the union responded by dispatching organizer Mark Ciurej. Smith became an enthusiastic union proponent among his coworkers at RELCO. He solicited his fellow employees to sign union cards on a daily basis before, during, and after work. Other employees testified that they viewed Smith as a persistent and visible organizer on behalf of the union campaign.

One RELCO employee Smith approached about the union was Jonathan Graber.[4] Graber was adamantly opposed to a union and repeatedly rebuffed Smith, telling Smith he was a "damn fool" for trying to unionize. Smith only stopped approaching Graber after Graber told him he was implacably opposed to the union and did not want to discuss it anymore. A day or two after that conversation, Graber saw CEO Bachman at a carwash and informed him about the union activity. Bachman replied that he already was aware of the campaign. Graber also spoke to two other supervisors about the campaign. He denied naming any particular employees as participating in the campaign, but the ALJ found this disclaimer not credible.

Several days after Graber spoke with Bachman about the union campaign, Bachman called a meeting on May 15, 2009 with all RELCO employees to speak about unions. Bachman first asked several contractors who belonged to a union to leave the room. In an hour long speech Bachman expressed his opposition to bring a union to RELCO, indicating that it would result in layoffs and impede his ability to provide pay raises and other opportunities for advancement. Bachman then asked if any employees had questions. Smith rose and asked if Bachman would agree to a

---

[4] Not to be confused with Timothy Kraber, another terminated employee discussed below.

discussion with employees about forming a union. Bachman replied "shut up and sit down."

On Monday June 8, Smith was using a cutting torch to strip steel plates from locomotive frames. He was wearing steel tipped boots as required by RELCO safety policies. Unfortunately the cutting torch created sparks which burned the laces and the stitches binding the soles of the boots. To deal with the situation Smith replaced the burned laces with zip ties and fastened the body of the boot to the sole with duct tape. Fabrication supervisor Cliff Benboe demanded that Smith replace the boots. Smith informed Benboe that he could not afford new boots, but Benboe was unmoved. On Tuesday and Wednesday, Smith went to work wearing boots without steel toes. Benboe noticed the boots were different from those Smith had been wearing before and asked if they were steel toed. Smith asserted that they were, but when Benboe pressed against a boot with a hammer, he discovered that it did not have a steel toe. Benboe ordered Smith into the break room and told him to wait there.

Benboe returned with Operations Manager David Crall. The two informed Smith that he would have to get steel toed boots before he could return to work. Smith replied that he would not be able to acquire new boots until 10 the next morning when his wife received her paycheck. Smith claims he inquired as to how this would affect his attendance record since he was already at the maximum amount of tardiness before he would be discharged under company policy. Benboe and Crall deny the issue of attendance was ever raised. Benboe did write an incident report that indicated that Smith would not be returning until 10 the next morning.

That evening, Smith borrowed money from his mother in law to obtain new boots. Before he could call Benboe to inform him he would be able to return to work on time Thursday, he received a voicemail from Benboe. In the ensuing telephone conversation, Benboe instructed Smith to report to a meeting at 10 that morning. At the meeting, Benboe and Crall informed Smith that they had spoken with Bachman

and decided to fire him for a gross safety violation, that is, for failure to wear steel toed boots. Smith claimed that the issue of attendance was never discussed at the meeting. Crall, by contrast, stated that the decision to fire Smith stemmed from his failure to arrive to work on time on Thursday, and that the supervisors had not yet come to a decision about the steel toed boots. The ALJ credited Smith's account of what had occurred at the meeting.

*2. Ronald Dixon*

Ronald Dixon worked as a fabricator at RELCO from December 2008 to September of 2009. Dixon was one of Smith's earliest recruits in the union campaign and regularly joined Smith in recruiting other employees. After Smith was terminated, Dixon became the leading union proponent among the RELCO employees. He continued soliciting employees to sign union cards until the day he was terminated. Like Smith, Dixon continually approached Jonathan Graber about forming a union and was rebuffed and told he was a "damn fool."

After Smith had been terminated and while Dixon was the leader of the RELCO employees favoring a union, BRS organizer Ciurej sent a five page letter to plant employees responding to anti union objections made in Bachman's May 15 speech. Bachman then called another meeting at the end of July to respond to Ciurej's letter. He followed up this meeting with a letter to all employees imploring them not to "fall for the union's hollow promises." He warned that if the employees joined the union, "our entire extremely generous wage and benefit package, that all of you already enjoy, would be negotiated between the Company and the union. The chalkboard could in essence be completely erased and all of these great benefits and wages you already have could be talked about for the first time between the parties." In September 2009, Ciurej planned to respond by handbilling outside the RELCO plant. Graber informed Bachman about Ciurej's plan.

About a week after Ciurej's handbilling, Dixon was assigned a job installing rain guards and spark arresters on top of a new locomotive. Dixon had never done this job before, so Benboe instructed him on how properly to perform the work. Dixon climbed to the top of the locomotive in accordance with Benboe's instructions and began work. Meanwhile, Bachman, Crall, and other managers were having a meeting in a conference room overlooking the shop floor. Bachman claims he looked out the window and saw Dixon working on top of the locomotive with his feet dangling over the edge. Bachman considered this to be an unsafe position because of the possibility of a fall. Dixon denied that his feet were ever dangling off the edge of the locomotive. Mark Baugher, an experienced fabricator, testified that he had seen Dixon working on the top of the locomotive that day and had not seen his feet hanging over the edge.[5] In any event, Bachman instructed that Dixon be ordered off of the locomotive.

Benboe testified that he then instructed Dixon either to center himself on top of the locomotive or position a ladder from which to work. Dixon claimed that he could not reach the part of the locomotive he was working on from a ladder. Nevertheless, he placed the ladder up against the locomotive in accordance with Benboe's wishes. Twenty minutes later, Bachman again claimed to have seen Dixon working with his feet hanging off the edge of the locomotive. Bachman ordered him off the car again and had Benboe escort him to the breakroom. Benboe informed Dixon there that he was fired for insubordination. Dixon initially assumed Benboe was kidding, but then asked to show Benboe where he had been working to demonstrate he had complied with his directive. Benboe refused and escorted Dixon out of the plant.

---

[5] Mark Baugher was later terminated, allegedly as a result of this testimony, but he was ordered reinstated in RELCO II.

*3. Timothy Kraber*

Kraber began working for RELCO a second time in March 2008. He had previously worked with the company from January to July 2007. When Kraber had begun his work at RELCO, the company paid for the cost of cleaning and maintaining employee uniforms. In early 2009, however, RELCO began deducting $36 per month from each employee's paycheck for this service. Employees were disgruntled, but no serious opposition manifested itself until Kraber began to suspect that RELCO was overcharging them. Kraber had spoken to a driver for the cleaning service and learned that RELCO was charged only about $34 per month for the cleaning. Kraber asked Operations Manager David Crall about this discrepancy, and he promised to investigate it. Kraber also noted that employees had never signed paperwork acknowledging the pay reduction before RELCO started deducting cleaning charges from their paychecks.

On March 4, 2010, Doug Bachman called a meeting to discuss the uniform cleaning issue. He also brought forms for the employees to sign authorizing RELCO to deduct cleaning expenses from their pay. At the meeting, Kraber challenged Doug Bachman as to whether RELCO was being charged less for cleaning than the amount of the deduction. Doug Bachman claimed not to know the answer. Kraber then proposed that the employees refuse to sign the authorization form until the company provided information about the cost of cleaning, and the employees voted to accept Kraber's proposal. The meeting then became heated as employees grew convinced RELCO was overcharging them. Kraber and another employee actively challenged Doug Bachman, who was also very upset.

While all of this was going on, Kraber was having issues with his attendance. Kraber had begun experiencing back problems near the end of 2009 that required him to take medical absences. RELCO's attendance policy assigned workers "points" for

every unexcused absence. Accumulating more than twelve points resulted in termination. Kraber met with Crall in December 2009 to discuss the number of points he had, contending that some of his points should be expunged because he had submitted written medical excuses. Crall promised to look into the matter. On December 4, 2009, Mark Bachman posted a memo near the employee breakroom about the medical release policy. The memo stated that only medical notes from a doctor would be acceptable for excused absences. Kraber, who had previously used notes from a chiropractor to substantiate his excused absences, claimed he never saw this memo.

Kraber missed work due to his back from January 19 through January 25, 2010. On the first two days Kraber saw a chiropractor who then referred him to a doctor. When he returned to work, Kraber submitted notes from the chiropractor and the doctor explaining his absence. Benboe and Crall met with Kraber on February 1 to tell him that he had fifteen points, well over RELCO's limit. They also informed him that due to the policy change his note from the chiropractor would not be accepted. Kraber contested the calculation of his points and said that he would "beat" them if the issue came before an unemployment hearing. He also informed the supervisors that he "wouldn't be dealing with this" if the workers had a union. Kraber spoke to supervisor Curt Peterson later that day, once again complaining about the attendance policy and suggesting that a union would solve these problems. Peterson promised to look into the attendance controversy and attempt to fix it. A few days later, Peterson told Kraber that his point total had been reduced to ten and would be reduced to six if he could provide a doctor's note to replace the chiropractor's note excusing January 19 and 20.

Kraber obtained a note from his doctor and submitted it to Peterson. Peterson contended that the note was illegible so Kraber called his doctor to request another. Instead, a nurse from the doctor's office called Peterson directly and explained the

content of the earlier note. Peterson then told Kraber that the note sufficed and his points would be expunged. While RELCO contends that Peterson had told Kraber he needed to bring in another note, Kraber's account was corroborated by another witness. On February 26, 2010, Kraber missed work and was assessed two attendance points. Crall told Bachman that Kraber now had 12 points and thus could be terminated, but Bachman said he wanted to review Kraber's record himself before making any decision. Bachman was on vacation at the time, and though he returned sometime after February 28, he left again on a business trip on March 2. He returned to the plant on March 5 (one day after the meeting about the uniform cleaning charge) and terminated Kraber on March 8.

Kraber had meanwhile returned to work on March 1 and was surprised when a week later he learned from Benboe that he had been fired. Kraber protested that Peterson had removed the attendance points he had accumulated for his absences on January 19 and 20. Benboe said that the termination decision was "final" and escorted Kraber from the building. Kraber called Peterson at his home that night to ask why the points had not been removed. Peterson claimed he had not gotten around to it but would speak to management the next morning. When Kraber returned his work uniform the next morning, he asked Crall if Peterson had spoken to him and repeated that he had provided the doctor's note. Crall promised to look into the matter, but he failed to contact Kraber. When Kraber called Crall, he was told that Bachman would not reconsider his termination because he could not read the doctor's note.

*4. Dane See*

Dane See began working for RELCO in January 2009. He participated in the March 4, 2010 meeting with Doug Bachman about the cost of cleaning employee uniforms. After the meeting concluded, See contacted the cleaning company directly to ask how much it charged RELCO for the service. A customer service

representative told See that RELCO was charged $6.20 per week per uniform. See then asked if the customer service representative would email him that quote. Instead, the representative emailed See to tell him that the $6.20 quote may have been inaccurate. After See emailed the representative once more, he had no further contact with the cleaning company.

The next day See discussed with his fellow employees what he had learned from the cleaning vendor. Later that day, See was confronted by Benboe and Crall about his contact with the cleaning representative, and then terminated for "inappropriate interaction with the vendor." Although RELCO initially claimed See had harassed the cleaning vendor it later discovered that See had been confused another employee. RELCO then changed its position and offered reemployment to See.

5. *The nondisclosure agreement*

Following the work uniform dispute, RELCO modified its nondisclosure agreement to forbid any employee from contacting its vendors to discuss the cost of uniform maintenance. The revised agreement also eliminated employee rights to recover litigation costs if the employee prevailed in an enforcement action brought by RELCO. Benboe distributed the new agreement on July 10 and warned employees that if they failed to sign it, they would have to "go upstairs" and speak to Bachman.[6] Several employees refused to sign the agreement. Benboe met with employees again several weeks later, read the names of those who had not signed the agreement, and again threatened that they would be sent to Bachman if they refused. While a few

_____

[6] Charles Newton was one of the employees who testified about how RELCO presented the nondisclosure agreement. He was later terminated, allegedly as a result of this testimony and other protected activities, and was ordered reinstated in RELCO II.

-11-

employees still refused to sign the agreement, there is no evidence that Benboe or Bachman ever disciplined them in any way.

B. Findings by the ALJ and Rulings by the NLRB in RELCO I

The ALJ found that Smith, Dixon, Kraber, and See had all been unlawfully terminated. See 29 U.S.C. § 158(a). Specifically, the ALJ found that the nondiscriminatory reasons given for the terminations of Smith, Dixon, and Kraber were pretexts masking RELCO's intent to punish them for union activity. The ALJ found that the reason given for See's termination—inappropriate contact with a vendor—was itself protected activity because it was a natural extension of the concerted action by RELCO workers with regard to the work uniform cleaning expense. The ALJ ordered reinstatement of all four employees, expungement of negative references from their employment histories, and back pay.

The ALJ also found that a nondisclosure agreement RELCO had distributed to its employees was overly broad and violated the National Labor Relations Act (NLRA). While RELCO argued that the issue was moot because the company has since withdrawn the agreement, the ALJ found no evidence that it had been withdrawn and ruled that the issue was not moot because the presence of the agreement had a substantial chilling effect on the ability of workers to engage in concerted action and it therefore required remediation. He ordered RELCO to post a public notice to its employees indicating that it had reinstated Smith, Dixon, Kraber, and See, and would refrain from interfering with the NLRA rights of its employees.

RELCO appealed to the NLRB, which affirmed the ALJ's decision in a two page order. It noted that the suspicious timing and pretextual nature of RELCO's termination decisions were strong evidence that hostility to unionization was the true reason for the firing of Smith, Dixon and Kraber. It also observed that only disputed

issue with respect to See was whether his actions with respect to the work uniform charges were protected activity under the NLRA, and concluded that the ALJ correctly determined that it was. The Board also rejected RELCO's challenge to the ALJ's credibility terminations and found no basis to reverse them. Finally, the Board modified the ALJ's remedial order to include also an order for public rescission of the nondisclosure agreement.

C. RELCO II Evidentiary Hearing

*1. Mark Baugher*

Mark Baugher began working for RELCO as a fabricator in March 2007. RELCO encouraged, but did not require, its fabricators to become certified welders. Baugher was not certified, and he attended union meetings and signed a union card during the 2009 campaign. On September 13, 2010, Baugher asked his supervisor to grant him a personal day off from work. He wanted to testify in the RELCO I unfair labor practices trial, but he did not reveal that information to his supervisor. The supervisor advised Baugher that he could only grant him a half day.

Later that day, CEO Mark Bachman emailed Operations Manager David Crall and asked him to prepare a reprimand to Baugher for not wearing his hard hat while on duty. Crall replied by asking for more details, but Bachman did not provide them because at that time he was occupied with hearings in RELCO I. The hard hat matter was put aside until the following week, and no one spoke to Baugher about the alleged infraction. On September 14, Baugher asked project manager Cliff Benboe for a vacation day. When Benboe expressed doubt that he could approve it on such short notice, Baugher revealed that he had been subpoenaed in the RELCO I case. Benboe replied "Oh, you're involved in this too?" and placed a call to Crall. Baugher was then granted time to appear and testify at the ALJ hearing. Baugher testified against

-13-

RELCO at the hearing on September 15 and contradicted Bachman's claim that Dixon had been working on top of a railcar with his feet dangling. Bachman was present for Baugher's testimony and read his related statement and affidavit.

The union election at RELCO was held on October 20, and a majority of employees voted against forming a union. Six days later while Baugher was working on a locomotive with another employee, he placed a blue flag on the train. The blue flag is a safety precaution which indicates to employees that a train is being serviced. RELCO safety rules prohibit moving a train or removing the flag before the worker who placed it can be located. Baugher neglected to remove the flag at the end of his shift, and RELCO personnel attempted unsuccessfully to locate him. After checking and verifying that the locomotive was clear, RELCO personnel removed the blue flag. Baugher discovered his blue flag was missing the next morning and informed Benboe about it. On November 1 RELCO suspended Baugher two days without pay and placed him on probation, citing both the hard hat incident on September 13 and the blue flag incident on October 26. The disciplinary report also claimed that Baugher had been smoking while working in an enclosed car on September 13, loitering, and exhibiting poor work performance.

In early December 2010, Baugher asked Crall when his probation would be lifted. Crall gave a vague response which did not identify any specific steps Baugher should take to lift his probation. At the end of the month Baugher received a performance review from Crall, his first in several years. Baugher was given a "satisfactory" rating in sixteen areas, an "exceeds expectations" rating in one, and "below expectations" in eight. Baugher's "growth potential" as an employee was rated "performance plateau." This term, which the ALJ described as something of a misnomer, meant that RELCO believed that Baugher had "learned basic job skills and knowledge and [was] actively working on refining that skill and knowledge." It differs from the also oddly named "performance peaking" rating, which is a negative

-14-

assessment indicating that the employee has been performing similar tasks for an extended period without improvement or desire to expand his or her skill set.

Crall indicated that Baugher had not bettered himself since joining the company and set goals for him which included obtaining his welding certificate and keeping his work area organized. While Bachman claimed that Baugher was given a 60 to 90 day deadline to obtain his welding certificate, the ALJ discredited that assertion and found no deadline had been communicated. Baugher took the welding certification test in early January, but did not pass. He was unable to retake the test, in part because he could not find times when both he and Benboe (who was to oversee the test) were available. After Baugher's failed test, no RELCO manager spoke about certification or any other issue relating to his performance review, nor indicate any dissatisfaction with his work. Baugher continued to be assigned to welding projections throughout early 2011. Although RELCO managers asserted that they had difficulty finding work for non certified welders in Baugher's position, the ALJ discredited that testimony.

On March 11, Benboe and Crall terminated Baugher. The reason given was that he had not made sufficient improvements on the areas identified in his performance review. Baugher asked Benboe if he had any problems with Baugher's performance, and Benboe answered he did not. Benboe told Baugher that he had been informed Baugher was being terminated only a half hour earlier. At an unemployment hearing, Crall testified that Baugher was given until the end of RELCO's first quarter to complete his welding certification. Baugher testified that this was the first he had heard of any such deadline.

*2. Charles Newton*

Charles Newton began working as a fabricator for RELCO in 2008. Newton attended union meetings and told his supervisor Jim Cronin that the unionization

campaign probably arose from what Newton characterized as the company's rough tactics towards its workers. Newton was also scheduled to testify during the RELCO I unfair labor practices hearing. Crall approached Newton shortly before the hearing and asked if he would speak to RELCO's attorney about his involvement in the case and what he would address in his testimony. Newton agreed and conversed with both RELCO's attorney and Crall for approximately five minutes.

Newton testified in RELCO I on September 15 about the company's nondisclosure agreement and the warnings that employees who refused to sign it would be sent to speak with Bachman. Newton denied seeing a memo RELCO claimed it posted rescinding the agreement. Bachman was present in the courtroom for Newton's testimony and had the opportunity to review his statement and affidavit. Newton was also an observer on behalf of the union during the subsequent union election on October 20. In that capacity Newton attended a meeting with Crall, another supervisor, and an NLRB agent regarding procedures to be used during the election. As noted above, a majority of employees voted against unionizing.

Newton received a work order to create a rear headlight for a train cab on November 29. He sought clarification of the work order from Cronin, his supervisor. Cronin suggested that he use a headlight located elsewhere in the shop for comparison. Newton then walked over to the location of that headlight and returned, passing Crall twice along the way. Crall asked Newton what he was doing, and Newton replied that he was in the process of building a headlight. Later, Cronin warned Newton that he was being "watched" and should not walk around anymore. Newton replied that he had only been inspecting a cab light as suggested by Cronin. Cronin warned him he should "be careful, they're watching you."

Later the same day, a coworker asked Newton to assist him in bending a remote box. RELCO employees commonly approached one another directly for assistance

if a foreman was not around. Newton agreed to help and walked to get his work gloves. Benboe saw Newton walking and asked what he was doing. Newton told him he was helping a coworker, and Benboe replied that he was walking around too much. When Newton offered to document his steps on a piece of paper, Benboe told him to drop the issue. At the end of Newton's shift, Cronin handed Newton a warning which alleged he had been unproductive and stating that any "further occurrence will result in disciplinary action, up to and including termination." Newton had never before been disciplined by RELCO or told he needed to increase his productivity.

In December of 2010 Crall gave Newton his first performance review in several years. The review stated that Newton's attendance was unacceptable and that he was "below expectations" in attitude, volume of acceptable work, and meeting deadlines. RELCO set goals for Newton to improve his attendance, obtain his welding certificate, and stay on task. It also rated Newton's growth potential as "performance plateau," the same level Baugher had received. Newton challenged RELCO's tabulation of his attendance record, and Crall eventually conceded error and agreed Newton's attendance was acceptable. Newton also challenged Crall's appraisal of his welding abilities and his attitude. Crall did not give any examples of Newton's alleged deficiencies in these areas.

Most of Newton's work in early 2011 was refurbishing and electrical in nature; he did not do any welding during that period. Newton was complimented for his work, however, and he did not receive any negative feedback or criticism at any point following his 2010 performance review. Nonetheless, Crall terminated Newton on March 11, 2011 for low productivity without providing any examples of poor performance or unproductive time. Newton's discharge letter claimed he had been put on probation following his December performance review, but the ALJ discredited this assertion as unsupported by any evidence.

*3 & 4. Richard Pace and Nicholas Renfrew*

Richard Pace began working for RELCO in 2009, and Nicholas Renfrew began in 2006. After attending an employee meeting on the morning of December 22, 2010, Pace overheard a conversation between two other employees who were speculating that employee Chris Kendall had been fired. Pace recalled that he had not seen Kendall at the morning meeting, but he was surprised to hear that Kendall had been fired because he was known as a good employee and a hard worker. Pace walked to his unit and asked a coworker "What's this I hear about Chris?" The coworker repeated the rumor that Kendall had been fired and wondered if it had been due to absenteeism, since Kendall had been off work the previous day to play Santa Claus at his child's school.

Soon the rumor that Kendall had been "fired for playing Santa Claus" spread through the RELCO shop. Renfrew heard the rumor from Pace and another employee and like Pace, Renfrew was surprised to hear of Kendall's apparent discharge. Pace and Renfrew shared the sentiment that if a well regarded employee like Kendall could be let go, any one of them could be next. At lunch RELCO workers continued to talk about Kendall's status. Pace, Renfrew, and many others expressed concerns that it was wrong to fire Kendall and worried that his discharge signaled cutbacks in the operation.

Meanwhile, Kendall was actually at work and unaware of his reported termination. He had been assigned to the "paint blast" room that day, which was isolated from the remainder of the plant. Starting at around 9 AM Kendall began to receive text messages from other employees asking if he had been fired. He replied that that was incorrect. Text messages continued, including one from Pace. Kendall responded that if he had been fired, RELCO was "playing a hell of a cruel joke on me, sticking me over here in blast." Both Pace and Renfrew eventually learned that Kendall had not been fired. Renfrew made a point to tell other employees that the

rumor was erroneous and that Kendall had actually been working in the paint blast room.

Towards the end of the day, Kendall's supervisor noticed that he looked agitated and asked what was wrong. Kendall replied, "If I'm going to be fired, I would like for a supervisor to be the one to tell me." Crall met with Kendall, who told him "If you're going to fire me, let's get it over with." Crall assured Kendall he was not being fired, only receiving a performance review, and in fact was getting a raise. Kendall then calmed down and went home from work. Crall told Bachman that Kendall had been upset by the rumors of his termination. Bachman then requested that Kendall save the text messages he received so Bachman could look at them. Bachman met with Kendall the next morning and asked to see the text messages. Kendall was reluctant to show them since he considered the matter resolved, but eventually he agreed. Bachman told Kendall again that he was doing a good job and would not be fired. Bachman also said he would take care of the matter.

Bachman met with Pace the following morning and asked about the rumors of Kendall's termination. Pace asserted that the entire shop knew of the rumor, and acknowledged he sent a text to Kendall asking if it was true. He did so because Kendall was a friend and he wanted to know if the rumors were true. Bachman charged Pace with having spread a malicious rumor about Kendall's livelihood and immediately terminated him. Bachman then met with Renfrew and had a similar conversation. Renfrew explained that once he learned that the rumor was false, he tried to stop the rumor's spread by telling other employees. Bachman told Renfrew that he had potentially destroyed Kendall's life by spreading malicious rumors. He then terminated Renfrew.

D. Findings by the ALJ and Rulings by the NLRB in RELCO II

The ALJ decided that all four employees had been unlawfully terminated. See 29 U.S.C. § 158(a) (barring retaliation against employees for engaging in protected

-19-

labor activity). He also found that the negative performance review and warning given to Newton were unlawful and that the discipline of Baugher in November had been increased in retaliation for his testimony before the union. He noted that both Newton and Baugher were treated differently than other employees without union connections who had been accused of similar infractions. He ordered reinstatement and backpay for all four workers and rescission of the disciplinary actions and negative performance reviews given to Baugher and Newton.

The NLRB affirmed on April 30, 2012 without substantial comment. While RELCO had objected to the ALJ's credibility determinations, the Board did not find any basis for reversing them. The Board also noted that while RELCO I dealt with similar labor law violations, it had not relied on that decision in ruling on the issues in RELCO II.

E. RELCO's Appeal of the NLRB decision and the NLRB's Application for Enforcement

RELCO petitions for review of the NLRB's decisions, and the NLRB applies for enforcement of its order. In both RELCO I and RELCO II the Board adopted the ALJ's factual findings and conclusions of law that the employees were terminated unlawfully with little or no modification. Thus, while we are reviewing the Board's decision, most of the specific factual and legal findings in each case were made in the first instance by the ALJ. The factual and legal analysis of each employee's termination is unique, and we address them individually below.

When reviewing a decision by the NLRB, "we afford great deference to the Board's affirmation of the ALJ's findings." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). We will enforce the Board's order if it "has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Id.

-20-

While normally an employer is free to discharge an at will employee for any or no reason, the National Labor Relations Act, 29 U.S.C. § 151 et seq., provides protections to workers who seek to form a union or otherwise engage in concerted labor activities. Id. at § 158(a). In appraising a challenge to an employee's termination allegedly caused by protected labor activity, the question is whether the employee's termination was motivated by the protected activity. Concepts & Designs v. NLRB, 101 F.3d 1243, 1245 (8th Cir. 1996). Motivation "is a question of fact that may be inferred from both direct and circumstantial evidence." Id.

The so called Wright Line analysis is applied when an employer articulates a facially legitimate reason for its termination decision, but that motive is disputed. See Wright Line, 251 NLRB 1083 (1980). The initial Wright Line burden is on the Board's general counsel to establish that the employee's protected activity "was a motivating factor" in his or her eventual termination. NLRB v. MDI Commer. Servs., 175 F.3d 621, 625 (8th Cir. 1999). The elements of this prima facie case are "(1) the employee was engaged in protected activity; (2) . . . the employer knew of the employee's protected activity; and (3) . . . the employer acted as it did on the basis of anti-union animus." NLRB v. Rockline Indus., 412 F.3d 962, 966 (8th Cir. 2005) (quoting FiveCAP, Inc. v. NLRB, 294 F.3d 768, 777 (6th Cir. 2002)) (ellipses original).

If the general counsel meets this burden, "the conduct is unlawful unless the employer proves it would have taken the same action absent the protected activity." MDI, 175 F.3d at 625. The existence of a nondiscriminatory rationale for the termination is not enough to establish this affirmative defense. Hicks Oils & Hicksgas, 293 NLRB 84, 85 (1989). In order to satisfy the employer's burden, the rationale cannot only be a potential or partial reason for the termination, it must be "the justification." Rockline, 412 F.3d at 970 (emphasis in original).

The Wright Line analysis is only necessary if the employer's stated rationale for termination is not activity protected by the NLRA. If the employer's stated reason is

itself an activity protected by the statute, the <u>Wright Line</u> analysis does not apply because the employer has conceded that its motive was unlawful. <u>St. Joseph's Hospital</u>, 337 NLRB 94, 95 (2001).

*1. Jeffrey Smith*

Applying the prima facie <u>Wright Line</u> test, the Board contends that RELCO knew that Smith was a union leader and this fact was a motivating factor in his termination. RELCO asserts in opposition that there is no substantial evidence that the company was aware of Smith's union activities, much less that it harbored animus towards such activity or that its decision to terminate Smith was motivated by it.

After reviewing the record, we conclude that substantial evidence supports the Board's position. There is considerable circumstantial evidence that RELCO's senior management was aware of Smith's union activities. Bachman had indicated he was aware of the union campaign at RELCO, of which Smith was the acknowledged leader. Smith spoke up in favor of forming a union at the May 15th meeting and was told by Bachman to "shut up and sit down." The ALJ found that Jonathan Graber had been informing Bachman about the union campaign and that Graber's denial that he had revealed the names of pro union employees to Bachman was not credible. Graber also admitted that he initiated discussions with management on several occasions to inform it about union activities.

Although Graber denied telling Bachman that Smith was involved in the union movement, the ALJ discredited Graber's assertion based on ample evidence in the record. The ALJ noted that Graber was openly and avowedly anti union, and bore a grudge against Smith and Dixon in particular for being overbearing in their efforts to get him to join a union. At key moments Graber also initiated discussions with RELCO senior management about the union campaign to keep it abreast of ongoing developments. As the ALJ observed, Graber enjoyed a "meteoric progression to a

coveted position with the company while the events of this case unfolded." Graber also displayed a guarded manner when testifying in this case which indicated to the ALJ that he was hiding information. We conclude that there is substantial evidence supporting the finding that RELCO management had knowledge of Smith's union activities.

There is also substantial evidence that RELCO harbored animus towards the union campaign in its facility. Upon learning of the campaign, Bachman called a meeting with all regular employees, except for union contractors who he requested leave the room. He then delivered an hour long speech pointing out the negative influence of unions. When Smith spoke out in favor of unions, Bachman demanded he "shut up and sit down," a clear indicator of hostility. We also agree with the ALJ that Bachman's comment to the effect that inviting a union to RELCO would allow for the "chalkboard . . . [to] be completely erased" was akin to a "bargain from scratch" threat which courts have found to be unlawful. See, e.g., NLRB v. Hitchiner Mfg. Co., 634 F.2d 1110, 1113 (8th Cir. 1980) (per curiam).

RELCO argues that Bachman's statements cannot be considered for several reasons. First it contends that Bachman's speech cannot be used as evidence of anti union animus because Section 8(c) of the NLRA prevents the "express[ion] of any views, argument, or opinion" from being used as "evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). We disagree. With respect to RELCO's "chalkboard" comment, we agree with the ALJ that it was akin to a "bargain from scratch" threat that would qualify as a "threat of reprisal." Similarly, Bachman's demand that Smith "shut up and sit down" was hardly an expression of a "view[], argument, or opinion," but could be considered as a threat of reprisal against Smith if he were to continue to advocate for the union since RELCO had indicated it terminates employees for "insubordination."

Moreover, the NLRB has consistently held that "an employer's antiunion comments, while themselves lawful, may nevertheless be considered as background evidence of animus toward employees' union activities." Tim Foley Plumbing Serv., Inc. 33 NLRB 328, 329 (2001). Section 8(c) is designed to shield employers from claims that rest solely on an employer's communication that it disfavors unionization. See NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969). That does not mean that these remarks be excised when considering whether the employer has evinced a hostility to unions. Otherwise, Section 8(c) would effectively prevent an employer's statement of hostility to unions from being used as proof of such an attitude.

RELCO also asserts that Bachman's statements cannot be considered because Smith was fired not by him, but by Benboe and Crall. It cites Cardenas v. AT&T Corp., 245 F.3d 994 (8th Cir. 2001), to argue that "remarks made by non-decisionmakers with no connection to the alleged adverse employment decision cannot support a reasonable inference of pretext." Id. at 1000. This reliance is misplaced. Cardenas was a Title VII case holding that the racial bias of supervisors not involved in the disputed employment decision could not be imputed to those who did make the adverse decision. Id. While it may be unreasonable to assume that an employee is speaking on behalf of the company when he or she expresses racist sentiments, the same is not true in the labor context. To the contrary, "it is eminently reasonable to assume that high-level corporate managers speak on behalf of the company when they express anti-union animus." Parsippany Hotel Mgmt. Co. v. NLRB, 99 F.3d 413, 423 (D.C. Cir. 1996). When Bachman, the company CEO, openly and overtly expressed to all RELCO employees his hostility towards unions, it is reasonable to assume that he was announcing the policy of RELCO. This viewpoint may then reasonably be imputed to other senior managers such as Benboe and Crall.

Substantial evidence also supports the Board's finding that RELCO's anti union outlook was the cause of Smith's termination, thus satisfying the final element of

Wright Line's prima facie burden. Circumstantial evidence which can support an unlawful motive includes "implausible . . . false, or shifting reasons" for a termination, Hall v. NLRB, 941 F.2d 684, 688 (8th Cir. 1991), the employer's hostility toward the union, Lemon Drop Inn, Inc. v. NLRB, 752 F.2d 323, 325 (8th Cir. 1985) (per curiam), and suspicious timing of a discharge, id. All of these factors are present here. RELCO demonstrated open hostility to unions, and Smith's termination came a mere one month after he publicly challenged Bachman's anti union speech. As for "shifting reasons," RELCO has continually vacillated between asserting that Smith was terminated for a safety violation (not wearing steel toed shoes) and for attendance issues. The ALJ found neither story plausible.

After management found he was wearing a defective boot, Smith was told to return to work with a pair of steel toed shoes; it was only after he complied that he was fired. The ALJ also found that Smith had been told to come into work at 10 AM the next day by his supervisors and that Crall was not credible in claiming that Smith's attendance was a stated reason for his termination. This evidence also prevented RELCO from establishing an affirmative defense, which required showing it would have terminated Smith even without his engaging in any protected activity. The Board's conclusion that RELCO's stated motives were pretextual provides substantial reason to reject its affirmative defense. See York Products, Inc. v. NLRB, 881 F.2d 542, 546 (8th Cir. 1989). We accordingly conclude that substantial evidence supports the Board's decision that Smith was unlawfully terminated due to his protected labor activities.

*2. Ronald Dixon*

Substantial evidence also supports the Board's position that Dixon was terminated because of his union activities. See Concepts & Designs, 101 F.3d at 1245. After Smith was fired, Dixon took over as the lead union advocate at RELCO, and substantial evidence indicates that RELCO was aware of his role. Significantly,

Graber had the same motives to tell RELCO management about Dixon as he did to inform on Smith, and the Board was thus entitled to infer that RELCO had knowledge of Dixon's protected activities. Similarly, the evidence of RELCO's hostility toward unionization is relevant to Dixon's termination as well. The nexus between Dixon's protected activity and his termination is even stronger, since his termination came just a few days after union organizer Ciurej handbilled outside RELCO's plant. This was a high profile pro union action taken while Dixon was the acknowledged leader of pro union activity at RELCO, about which Bachman was informed in advance by Graber. This satisfies the initial Wright Line burden to demonstrate that the employee was engaged in protected activity, that the employer knew of this protected activity; and that the termination was motivated by anti-union animus.

Under Wright Line, the burden now shifts to RELCO to show it would have terminated Dixon regardless of its anti union animus. RELCO's stated reason for terminating Dixon was that he was insubordinate by allegedly refusing to listen to Bachman's order that he not dangle his feet off the side of the railcar. There is ample evidence that this was a pretext. Dixon denied that his feet were ever dangling off the car to begin with, let alone after he was initially reprimanded, and he claimed that he placed the ladder on the car precisely where he had been instructed by Benboe. Dixon's account was corroborated by another worker, Baugher, who testified that he never saw Dixon's feet dangling off the edge of the railcar.

RELCO responds that it does not matter whether Dixon really was engaged in the claimed safety violation or not, only whether Bachman believed that he was and that he had insubordinately disregarded instructions. See Johnson v. AT&T Corp., 422 F.3d 756, 762 (8th Cir. 2005). The ALJ was entitled to discredit Bachman's assertion that he believed Dixon was behaving insubordinately. Dixon presented evidence that he actually had not disregarded Bachman's instructions, and this buttressed the ALJ's determination that Bachman's conflicting claim was either implausible or an outright fabrication. See Hall, 941 F.2d at 688. Dixon's perception

is further supported by the fact that immediately after his summary termination by Benboe, he offered to show Benboe his workspace to verify that the safety ladder had been properly placed, but Benboe refused. This supports the inference that RELCO management was looking for an excuse to terminate a known union sympathizer. Substantial evidence supports the Board's determination that Dixon's termination was motivated by anti union hostility. Since RELCO could not demonstrate that Bachman actually believed Dixon was insubordinate, it follows that RELCO could also not demonstrate insubordination was "the justification" for his termination. Rockline, 412 F.3d at 970 (emphasis original).

*3. Timothy Kraber*

While Kraber was a union sympathizer like Dixon and Smith, the circumstances of his termination are more closely related to his protests involving the work uniform issues than for his union activities. Though not formally part of the unionization campaign, the attempts by workers to remove the RELCO uniform cleaning charge to their paychecks, or at least to ensure that the company was not overcharging them for the service, is a "concerted activity" protected by Section 7 of the NLRA. 29 U.S.C. § 157 (protecting employees' rights to engage in "concerted activities for the purpose of . . . mutual aid or protection").

There is no dispute that RELCO knew that Kraber was involved in the work uniform issue. He was the first to express concerns about it to RELCO management, and he was a vocal participant in the meeting with Doug Bachman where RELCO workers collectively expressed their discontent about the uniform issues. There is also substantial evidence that RELCO management was unhappy with Kraber's concerted activity. At the March 4 meeting, Kraber challenged RELCO's work uniform policy and stated his belief that the company was overcharging its employees for cleaning the uniforms. While Doug Bachman ultimately agreed with Kraber's suggestion to maintain the status quo until RELCO was able to provide detailed cost information,

-27-

the meeting became increasingly heated after his comments. Thereafter Doug Bachman appeared greatly agitated at the insinuations by Kraber and others that the company was in effect taking money from its workers.

Substantial evidence exists supporting the Board's finding that Kraber was terminated because of his acrimonious interaction with Doug Bachman in connection with the protected activity. RELCO management was aware there was an ongoing dispute about how many attendance points Kraber possessed. Even when the company's records showed him as having fifteen points, it permitted him to continue working until he was able to get some points expunged. When Kraber reportedly reached the twelve point threshold again on February 26, Bachman once more delayed terminating him until the company had the opportunity to examine Kraber's record more closely, no doubt because he knew some of those points were disputed. RELCO raises a question posed elsewhere by the Seventh Circuit: "If [the company] acted with retaliatory intent, then why did it delay . . . ?" NLRB v. Stor-Rite Metal Products, Inc., 856 F.2d 957, 965 (7th Cir. 1988). The answer in this case may be straightforward. Prior to Kraber's public challenge to RELCO management about the uniforms, the company may not have been planning to terminate him, or at least had been planning to investigate his claim that his attendance points should have been expunged.

RELCO argues that evidence that Peterson had already expunged some of Kraber's attendance points and decided his doctor's note was acceptable was inadmissible hearsay because it came from Kraber and a witness to his conversation with Peterson. The NLRB responds that Peterson's statement is admissible under F.R.E. 801(d)(2)(D) as an admission against interest concerning a matter within the scope of Peterson's agency. It also points out that the Federal Rules of Evidence are only advisory in Board proceedings, see 29 U.S.C. § 160(b); NLRB v. Addison Shoe Corp., 450 F.2d 115, 117 (8th Cir. 1971), where hearsay is admitted if probative and corroborated by other evidence. RC Aluminum Indus., Inc., 343 NLRB 939, 940

(2004).  RELCO rejoins that the general counsel never established the foundation for this hearsay and that Bachman, not Peterson, had authority for making attendance policy decisions.  See Mitroff v. Xomox Corp., 797 F.2d 271, 276 (6th Cir. 1986).

We review evidentiary decisions for abuse of discretion, Bennett v. Nucor Corp., 656 F.3d 802, 809 (8th Cir. 2011).  Here, the ALJ had sufficient grounds to admit Peterson's testimony.  Peterson possessed at least apparent authority to expunge attendance points and he had done so for Kraber once before.  Moreover, even if Peterson could not alter attendance points himself, there is little dispute that he was acting within his authority when he presented information to senior managers at RELCO about Kraber's note or Peterson's conversation with the doctor's office.  Finally even if it were hearsay, Peterson's statement was corroborated by other evidence and is thus admissible in an administrative proceeding.  See RC Aluminum, 343 NLRB at 940.

Even if RELCO were to prevail on this evidentiary challenge, that would not dispose of the actual question before the Board.  The relevant question is not how many attendance points Kraber "officially" had at any given time, but whether Bachman's decision to fire Kraber instead of investigating his unexcused absences was caused by Kraber's protected concerted activity.  Bachman knew that Kraber's attendance record was under dispute, and he appeared willing to investigate the issue right up until Kraber challenged his brother about the work uniform issues.  At that point Bachman's cooperation immediately ceased, and Kraber was terminated.  Bachman's unwillingness to consider the doctor's note Kraber provided, in conjunction with Peterson having confirmed the content of the allegedly illegible note, further supports the finding that the termination decision was motivated at least in part by Kraber's protected activity.

RELCO argues that the delay from February 26 to March 8 is attributable only to Bachman's absence during much of that period.  The ALJ rejected that explanation,

however, after noting that Bachman actively discussed Kraber's case while he was away and that RELCO terminated <u>another</u> employee (Dane See) during the same time period for actions relating to the same work uniform dispute. The ALJ determined that this justification was a "sham." There is substantial evidence to support these findings.

*4. Dane See*

Dane See was terminated on March 4 for inappropriate contact with a vendor. The ALJ found that this contact was itself protected activity. Consequently, the <u>Wright Line</u> burden shifting framework does not apply, since that analysis is only necessary where the case turns on the employer's motivation. <u>St. Joseph's Hospital</u>, 337 NLRB at 95. When the employer's admitted motivation encompasses protected labor activity, the employer has in effect admitted an NLRA violation, and there is no need to proceed with the <u>Wright Line</u> analysis. RELCO challenges the Board's decision on two grounds. First, it argues that See's discussion with the work uniform vendor was not protected activity because it was not "concerted" action. It contends that See's decision to contact the vendor was "solitary" in nature, not done with the approval of other employees. Second, it claims that the actual reason for See's termination was RELCO's belief he had harassed a vendor, and that such a termination is permitted even if the harassment occurs as part of protected concerted activity.

Substantial evidence supports the Board's conclusion that See's contact with the vendor was concerted action. Action is "concerted" when it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." <u>Meyers Industries, Inc.</u>, 268 NLRB 493, 497 (1984) (<u>Meyers I</u>). Such action can include that of individual employees if it "represents either a continuation of earlier concerted activities or a logical outgrowth of concerted activities." <u>Mobil Exploration & Producing U.S., Inc. v. NLRB</u>, 200 F.3d 230, 238 (5th Cir. 1999) (quotation omitted). <u>See also JCR Hotel, Inc. v. NLRB</u>, 342 F.3d 837, 840 (8th Cir.

-30-

2003). Thus, even action which "involves only a speaker and a listener" can qualify as concerted action if "it had some relation to group action in the interest of the employees." Meyers Industries, Inc., 281 NLRB 882, 887 (1986) (Meyers II). RELCO does not dispute that employees' expression of concern about the uniform cleaning charges at the March 4 meeting was concerted activity. See's discussion with the vendor came later that evening and was on the exact same issue. On this record, substantial evidence supports the ALJ's finding that See's call to the vendor was a continuation of the concerted action the other employees had engaged in at the March 4 meeting.

RELCO alternatively contends that it actually discharged See because it believed he had been rude and harassing to the vendor. An employer can terminate an employee for rude or abusive behavior even if that behavior occurs during protected concerted action. Carleton College v. NLRB, 230 F.3d 1075, 1080–81 (8th Cir. 2000). RELCO now concedes that it had confused See with another employee and that See was not actually the employee who had allegedly harassed the vendor. It claims however that it cannot be liable under the NLRA if this admittedly mistaken belief was the actual motivation for See's termination. See Johnson, 422 F.3d at 762. While RELCO's argument could be validated in a situation where the company's stated motive for termination was neutral, the Supreme Court has declined to extend this safe harbor to circumstances where the stated motivation was "an alleged act of misconduct in the course of [protected] activity." NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23 (1964). In such circumstances, so long as the employee was not "in fact guilty of that misconduct," the employer's honest belief to the contrary does not exempt it from liability. Id. Since RELCO concedes that See did not actually engage in the abusive conduct for which he was terminated, its argument does not provide a safe harbor. See id.

*5. Mark Baugher*

Baugher's testimony before the NLRB in <u>RELCO I</u> is protected activity under the NLRA. 29 U.S.C. § 158(a)(4). The Board found that RELCO knew about this testimony and that it was a motivating factor in the company's decision to discipline and eventually discharge him, thus satisfying the prima facie <u>Wright Line</u> burden. RELCO contends that the second and third elements of the <u>Wright Line</u> test are not met because it claims it did not know Baugher had testified in <u>RELCO I</u> and that this testimony did not motivate their decision to terminate him.

RELCO first contends that it cannot be proven that it knew that Baugher (or Newton) were involved in protected activity despite the fact that Bachman was present at the NLRB hearing where they testified. It argues that the ALJ's admission of "the transcripts of the [<u>RELCO I</u>] proceedings [was] for the sole purpose of showing animus" and that this ground was impermissible. The ALJ specifically declined to use the hearing transcripts as proof of anti union animus, however, even though he could have. <u>See</u> <u>NLRB v. La-Z-Boy Midwest</u>, 390 F.3d 1054, 1061 (8th Cir. 2004) ("The Board generally may rely upon, take notice of, and use as background the findings and decisions in makes in other cases," so long as they are not "the sole basis for its decision on motivation in a subsequent matter."). The ALJ used the transcripts simply to show that Bachman was aware that Baugher (and Newton) testified at the hearing and that their testimony had been adverse to his interests, not for the purpose of showing that the testimony was true. There was no error in admitting them for that purpose.

RELCO next argues that there is no substantial evidence indicating that the company harbored any animus towards Baugher's testimony. Circumstantial evidence which supports a determination of animus and unlawful motivation includes "suspicious timing, false reasons given in defense, failure adequately to investigate alleged misconduct, departures from past practice, tolerance of behavior for which the

employee was allegedly fired, and disparate treatment of the discharged employees." Medic One, Inc., 331 NLRB 464, 475 (2000). Baugher was disciplined less than two months after his testimony and less than two weeks after the union election was held. While five nonparty employees testified in RELCO I, Baugher and Newton were the only two to have testified adversely to RELCO and to have signed a statement on behalf of the union in that proceeding, and both were terminated thereafter.

The ALJ also found that while Baugher had committed infractions which could justify some discipline (failing to wear a hard hat and forgetting his blue flag), RELCO managers embellished these incidents after Baugher's testimony and added new allegations (that Baugher had been smoking, loitering, and unproductive) in order to justify his suspension and probation. The decision to add after the fact justifications to prior misconduct is itself a recognized ground for inferring animus. See Rockline, 412 F.3d at 969–70. RELCO's performance review explicitly relied on this punishment as grounds for denying Baugher a pay raise and demanding he improve his work performance. Baugher's eventual termination was premised on that performance review. An adverse employment decision is unlawful if it relies upon and results from a previous unlawful action. Dynamics Corp., 296 NLRB 1252, 1254 (1989). The ALJ also discredited RELCO's assertion that Baugher was terminated because he lacked a welding certificate. He noted that four other employees who lacked welding certificates had not been discharged or placed on probation for that reason, that Baugher was never given an ultimatum to obtain a certificate or be terminated, and that there was no evidence that Baugher's work performance was substandard. The ALJ therefore found that RELCO's rationales for disciplining and terminating Baugher were pretexts for unlawful discrimination.

RELCO also attacks the ALJ's credibility findings. When determining whether credibility determinations are supported by substantial evidence, we afford great deference to the findings of the ALJ and the Board and will not overturn them unless they shock the conscience. JHP & Assocs., LLC v. NLRB, 360 F.3d 904, 911 (8th

-33-

Cir. 2004). There are no grounds for disturbing them here. The ALJ carefully examined the record and witness demeanor in reaching his determinations. See Beaird-Poulan Div., Emerson Elec. Co. v. NLRB, 649 F.2d 589, 593 (8th Cir. 1981). Contrary to RELCO's claim, the fact that the ALJ discredited some of Baugher's testimony about the blue flag incident did not require him or the Board to discredit the whole of his testimony. Rather, it demonstrates the careful and tailored review the ALJ gave to the credibility of each witness testimony.

RELCO challenges the ALJ's finding that it shifted its position and embellished the misconduct it attributed to Baugher after he testified in RELCO I. It admits that Bachman's initial email about the September 13 incident only mentioned Baugher not wearing a hard hat, but it points out that Crall asked for more details before filing his report. It claims that the new allegations (of smoking, loitering, and unproductivity) which appeared in the reprimand letter Baugher received more than a month later were the additional "details" Crall had sought. The ALJ had substantial evidence entitling him to reject this account. He noted that there was a seven week delay between the charged infraction and the reprimand and that in the interim nobody had spoken to Baugher, despite the fact that these alleged violations could have exposed RELCO to monetary liability. RELCO claims that it held off on imposing discipline on employees on advice of counsel because of the scheduled union election, but it did issue reprimands to other employees during that time.

RELCO also objects to the ALJ's use of comparator analysis, arguing that the comparators the ALJ identified were not similarly situated. See Pope v. ESA Servs., Inc., 406 F.3d 1001, 1009 (8th Cir. 2005). It argues (1) that the four employees the ALJ used were not similarly situated because they had less seniority than Baugher and Newton, and (2) that the ALJ "cherry picked" the comparator class because it did not include two other employees who were dismissed for unspecified "poor performance" or lack of needed skills.

-34-

The record indicates however that the comparator evidence was valid. The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." Ridout v. JBS USA, LLC, __ F.3d __, 2013 WL 266171, at *5 (8th Cir. June 14, 2013) (quoting Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010)). Like Baugher, the four employees analyzed by the ALJ as comparators had a goal of becoming certified welders. Like Baugher, none achieved the goal, but unlike Baugher, none of the comparators was discharged. While RELCO attempts to distinguish these employees based on seniority, the ALJ noted that each was assessed by the company as being in the same stage of professional development as Baugher: "performance plateau." RELCO does not show how the employees the ALJ did not consider were "substantially similar" to Baugher other than that their reasons for termination sound vaguely similar to his. The ALJ thus had no obligation to include them in his comparator analysis.

For these reasons, substantial evidence supports the ALJ's finding that the excessive punishment given to Baugher for his safety violations was motivated in part by his testimony in RELCO I. Baugher's eventual termination stemmed from that prior discipline, and its pretextual nature was additionally supported by comparator analysis.

*6. Charles Newton*

Much of the analysis regarding Baugher's reinstatement supports the Board's decision in Newton's case as well. RELCO was aware of Newton's union activities, both from his testimony at RELCO I and his status as an observer during the election. While the ALJ agreed that Baugher had committed some infractions, he was skeptical that Newton had committed any violations at all. He noted that the only evidence of Newton's alleged lack of productivity was when he walked around the shop primarily at the recommendation of his own supervisor, who then warned him that he was being "watched." RELCO asserts that what matters is not whether Newton was actually

unproductive, but whether RELCO management believed that he was. The ALJ's determination that in all likelihood Newton was not being unproductive also permitted him to doubt the claims of his supervisors that they honestly believed that he was not productive and to conclude that their rationale was a pretext for anti union animus similar to that exhibited toward Dixon. See Hall, 941 F.2d at 688.

RELCO was never able to identify a single incident of Newton having been unproductive other than that isolated event after it elected to terminate him in March 2011. RELCO admits that it never checked to see if Newton had been unproductive after his December 2010 performance review. Newton also had no other disciplinary marks on his record and only positive feedback following his performance review. The suggestion that Newton was terminated for failure to obtain a welding certificate is particularly dubious. As discussed above with respect to Baugher, no comparator who had not been engaged in protected activity was terminated despite failing to obtain a welding certificate. More importantly, none of the jobs Newton worked on after his December performance review involved welding. Substantial evidence thus supports the Board's decision that RELCO's rationale for his termination was a pretext and could therefore be discredited. See Berbiglia, Inc. v. NLRB, 602 F.2d 839, 845 (8th Cir. 1979).

*7. Richard Pace and Nicholas Renfrew*

Pace and Renfrew were both terminated for allegedly spreading a "malicious rumor" that their coworker Chris Kendall had been terminated. Neither party disputes that this was the actual reason for Pace and Renfrew's terminations or that it was a pretext for some other rationale. The critical question is whether Pace and Renfrew's statements on this question were protected "concerted activity" under Section 7 of the NLRA. See 29 U.S.C. § 157. If the employer's admitted motivation amounts to a violation of the NLRA, there is no need to engage in the Wright Line inquiry because the employer's unlawful motivation has already been established. St. Joseph's

Hospital, 337 NLRB 94, 95 (2001). On the other hand, if the activity that prompted Pace and Renfrew's termination was unprotected by the NLRA, then RELCO's actions were legal because no party asserts that RELCO's stated motive was a pretext for any other potentially protected activity.

RELCO asserts that this was a mixed motive case requiring Wright Line analysis, and the Board disagrees. In the cases RELCO cites, St. Luke's Episcopal-Presbyterian Hosps. v. NLRB, 268 F.3d 575 (8th Cir .2001), Carleton College , 230 F.3d at 1075, and NMC Finishing v. NLRB, 101 F.3d 528 (8th Cir. 1996), our court concluded that the challenged activity was not protected by Section 7. We proceeded nonetheless to apply Wright Line because the termination might have actually been motivated in part by other protected actions by the employee. If the activity of Pace and Renfrew was protected under the statute, by contrast, there would be no dispute about the employer's motivation and thus no need to apply Wright Line.

For example, in Carleton College an employee had not received a contract extension after being rude and insubordinate during a meeting about his future employment. 230 F.3d at 1077. We held that this insubordinate conduct was not protected by the NLRA. Id. at 1080–81. At that point, Wright Line became very relevant because the employee had also engaged in protected labor actions, and his termination might have actually been motivated in part by those earlier activities. See id. at 1080. If the allegedly insubordinate activity had itself been protected, Wright Line analysis would not have been necessary.

In this case there is no dispute that RELCO discharged Pace and Renfrew because they had spoken about the rumor that Kendall had been fired. RELCO's main argument is that their speech had not been "concerted action" under Section 7 of the NLRA. Wright Line would not be implicated if the Board was correct in holding that Pace and Renfrew were engaged in protected concerted action in talking about Kendall's posisble termination. If the speech was protected, RELCO's admitted

-37-

motivation was unlawful. If RELCO is correct that their speech was not concerted action, then the terminations were lawful because the Board has not argued that RELCO's rationale was a pretext for any other unlawful motivation.

Action is "concerted" when it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." Meyers I, 268 NLRB at 497. This includes activity seeking "to initiate or to induce or to prepare for group action." Meyers II, 281 NLRB at 887. The Board's reasonable determination about the scope of Section 7 is entitled to "considerable deference." NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 829 (1984).

The ALJ's determination, adopted by the Board, that the activity of Pace and Renfrew was "concerted" was reasonable. Repeated conversations about the effect of a company decision on other workers qualifies as concerted activity, and an employee cannot be terminated for engaging in such conversations. NLRB v. Sencore, Inc., 558 F.2d 433, 434 (8th Cir. 1977) (per curiam). An overt agreement is not required to support a finding of concerted action. Whittaker Corp., 289 NLRB 933, 933 (1988). While mere "griping" is not protected by the NLRA, JCR Hotel, 342 F.3d at 840, the ALJ reasonably found here that these employees had done more than that. The discussion about Kendall's termination provoked worries that the company was preparing for mass layoffs or that even popular and productive employees like Kendall could be eliminated by overstrict interpretations of the company's workplace policies.

The evidence indicates that any incipient concerted action by the employees dissipated once they learned that Kendall had not been discharged. Nonetheless, the NLRA protects conversations which are precursors to or preparation for group action on behalf of employees. Meyers II, 281 NLRB at 887. Conversations between individual employees are often an "indispensable preliminary step to employee self-organization." Id. Nor is it dispositive that the concerted action in this case never materialized because it turned out Kendall had not been terminated. In Parexel Int'l,

LLC, 356 NLRB No. 82, 2011 NLRB LEXIS 25 (Jan. 28, 2011), a company terminated an employee who had been inquiring about wage disparities about which she had been misinformed, but before she was able to converse with any of her fellow employees. The NLRB found that such a "preemptive strike" still violated the NLRA. Id. at *6. This was so even though presumably no concerted action actually would have materialized once the employee found out the alleged wage disparity did not exist. Pace, Renfrew, and many others discussed Kendall's purported termination and expressed concern that it signified a dramatic shift in RELCO's treatment of its workers. Their concerns were then assuaged when they learned that Kendall had not been fired, but this satisfactory resolution does not mean that the employees had not been preparing to engage in concerted action.

Finally, RELCO asserts it could terminate Pace and Renfrew because their statements were not true. Under labor law, "within the area of concerted activities, false and inaccurate employee statements are protected so long as they are not malicious." Wabeek Country Club, 301 NLRB 694, 699 (1991). While RELCO characterized Pace and Renfrew's statements as "malicious," that is, made with either actual knowledge of their falsehood or with reckless disregard for their veracity, see Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 62–63 (1966), there was no evidence supporting such a finding. Substantial evidence to the contrary indicates that many workers in the RELCO plant honestly believed that Kendall had been fired. Both Pace and Renfrew stopped spreading the rumor once they found out it was untrue, and Renfrew actively attempted to arrest its spread. Even assuming that RELCO honestly believed that Pace and Renfrew had behaved maliciously, that subjective belief is irrelevant unless the two workers were actually guilty of the alleged misconduct during their protected concerted activities. Burnup & Sims, 379 U.S. at 23.

*8. The nondisclosure agreement*

The final issue the Board ruled upon related to a nondisclosure agreement RELCO circulated in July 2010. The ALJ found the agreement facially violated the NLRA by barring workers from speaking to vendors about an ongoing labor dispute. RELCO does not defend the nondisclosure agreement, but it contends that the issue is moot because it voluntarily withdrew the agreement. The ALJ observed, however, that there was no admitted evidence establishing this and in any event the agreement had a chilling effect on the worker's concerted activity.

The Board's order to rescind the nondisclosure agreement was supported by substantial evidence. Requiring RELCO to disavow it publicly may help remedy some of the chilling effect that the agreement had on its employees. While RELCO asserts that the court can take its "admission" in its brief that the agreement has been withdrawn as evidence, see Postscript Enterprises v. Bridgeton, 905 F.2d 223, 228 (8th Cir. 1990), the Board had reason not to take RELCO at its word given the ALJ's emphatic findings that the company repeatedly engaged in duplicitous assertions and misrepresentations over the course of these labor disputes. In such circumstances the order requiring that the nondisclosure agreement be withdrawn and disavowed is not moot.

F. Conclusion

We conclude that the NLRB's decisions were supported by substantial evidence in all respects. We turn next to RELCO's challenge the board's composition and its authority to reach the decisions at issue in this case.

-40-

II.

After briefing on this appeal was submitted, the United States Court of Appeals for the D.C. Circuit ruled on January 25, 2013 in Noel Canning v. NLRB, 705 F.3d 490 (D.C. Cir. 2013), that three appointments to the NLRB were invalid under the recess appointments clause of the U.S. Constitution. This clause enables the President "to fill up all Vacancies that may happen during the Recess of the Senate," U.S. Const. art. II, § 2, cl. 3. The Noel Canning panel decided that the issue of whether the NLRB had a quorum was an "extraordinary circumstance" which justified hearing the appointments clause challenge, even if it had not been raised below. Id. at 497.

The court concluded that "the Recess" referred to in the Constitution only applies to intersession recesses (that is, recesses which occur between two sessions of Congress), id. at 506–07, and it defined the word "happen" to mean "arise," id. at 508.[7] It then concluded that the recess appointments clause only allows the President to make such appointments during an intersession recess of the Senate, for vacancies which arose during that intersession recess. Id. at 514. Since President Barack Obama's three recess appointments to the NLRB were made during an intrasession recess and were not made to fill vacancies which arose during an intersession recess, the D.C. Circuit panel concluded they were invalid and that the NLRB lacked a quorum at the time of its decision in this case. Id. at 515.

This decision created a circuit split. The Eleventh Circuit had already affirmed the validity of similar recess appointments. Evans v. Stephens, 387 F.3d 1220 (11th Cir. 2004) (en banc). See also United States v. Woodley, 751 F.2d 1008 (9th Cir.

---

[7] Judge Griffith concurred only in the conclusion that the constitutional term "the recess" refers to a intersession recess. He would not have reached the question of whether a vacancy only "happens" during the recess of the Senate if it arises at that time. Id. at 515 (Griffith, J., concurring in part and concurring in the judgment).

1985) (en banc); United States v. Allocco, 305 F.2d 704 (2d Cir. 1962) (rejecting only the argument that the vacancy must have arisen during the recess). Following oral argument in the RELCO cases before our court, panel majorities on the Third and Fourth Circuits also ruled that the recess appointments of the members of the NLRB were unconstitutional, albeit based on slightly different rationales. NLRB v. New Vista Nursing and Rehabilitation, 719 F.3d 203 (3d Cir. 2013); NLRB v. Enter. Leasing Co. Se., LLC, __ F.3d __, 2013 WL 3722388 (4th Cir. July 17, 2013). The Supreme Court granted certiorari in Noel Canning to resolve this conflict. 133 S.Ct. 2861 (June 24, 2013) (No. 12-1281).

RELCO filed a Rule 28(j) letter in these cases on February 19, 2013 seeking to raise a similar challenge to the Board's composition. Though RELCO did not raise the issue before the NLRB or in its briefing in this case, it now argues that we should deny the NLRB's application for enforcement because the Board lacked a lawful quorum at the time. Decisions have been rendered in the matters now before our court, however, and we requested supplemental briefing on four issues:

1) Whether the challenge to the NLRB's quorum is jurisdictional?
2) If it is not jurisdictional, did RELCO waive the issue?
3) If it was waived, should we nonetheless decide the issue?
4) Assuming we can decide the issue, were the appointments to the NLRB validly made in accordance with the Recess Appointments Clause?

We address these issues in turn, but first provide some additional background on the recess appointments at issue.

A.

The NLRB has five members by statute, of which three are required to maintain a quorum. New Process Steel v. NLRB, 130 S. Ct. 2635, 2645 (2010). Presidential appointments to the NLRB are typically made "with the Advice and Consent of the Senate," U.S. Const. art. II, § 2, cl. 2, but the President also possesses the power "to fill up all Vacancies that may happen during the Recess of the Senate," U.S. Const. art. II, § 2, cl. 3. At the time of the NLRB's decision in these cases, three appointees to the Board were "recess" appointments made by President Obama on January 4, 2012: Sharon Block filled a seat that had become vacant on January 3, 2012; Terence Flynn filled a seat that had become vacant on August 27, 2010; and Richard Griffin, filled a seat that had become vacant on August 27, 2011.

At the time of these recess appointments on January 4, 2013, the Senate was meeting in "pro forma" sessions every three business days from December 20, 2011 through January 23, 2012. These pro forma sessions were held because Article I, § 5, cl. 4 of the Constitution prevents the Senate from "adjourn[ing] for more than three days" without the House's consent (and vice versa). The House had declined to allow the Senate to adjourn for more than three days, in part because some House Republicans believed it would prevent the President from making any recess appointments. See Letter from Rep. Jeff Landry, U.S. House of Representatives, to Rep. John Boehner, Speaker of the House (June 15, 2011) (collecting the signatures of seventy seven Representatives).

While the House believed that compelling these pro forma sessions meant the Senate was not in "recess," the Senate itself appeared to disagree. Senate Majority Leader Harry Reid referred to the Senate's status at this time as a "recess." 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011) (statement of Senator Reid). Senators were not required to be present, and no business was conducted during these sessions, though an exception was made on December 23 to extend the payroll tax cut. In general the

Senate would be gaveled into order and then immediately adjourned for another three days. The Senate also met on January 3, 2012 to begin the second session of the 112th Congress. <u>See</u> U.S. Const. amend. XX ("The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day.").

The Senate recesses in one of two ways. An adjournment <u>sine die</u> terminates a legislative session. Henry Robert, <u>Robert's Rules of Order</u> 109–10, 169–70 (1877), creating what is known as an <u>intersession</u> recess—a gap between two sessions of Congress. When the Senate adjourns to a particular day, by contrast, it has made an <u>intrasession</u> recess, or a break in activity within a single session of Congress. Congress had no intersession recess during the 112th Congress, because as soon as it adjourned <u>sine die</u> to end the first session on January 3, it immediately reconvened to begin the second session. Thus, the recess appointments at issue in this case were made during the Senate's intrasession recess.

The NLRB issued its decisions in April 2012. RELCO petitioned for review of these rulings in May and June of 2012, and the NLRB cross applied for enforcement of its order. Briefs were filed in October 2012, and the case was set on the May 2013 argument calendar.

B.

Since RELCO did not challenge the composition of the NLRB either before the Board or in its initial briefs on appeal, it must provide a reason why this court should nonetheless address the merits of its argument. RELCO's primary contention is that its challenge goes to our subject matter jurisdiction, which cannot be waived even if not raised by a party. <u>See</u> <u>Sipp v. Astrue</u>, 641 F.3d 975, 980 (8th Cir. 2011).

-44-

These cases are unique in that the question of subject matter jurisdiction could potentially be fatal to either side's argument. On the one hand, RELCO argues that because the Board did not have three validly appointed members, it lacked subject matter jurisdiction to issue its decision. On the other hand, the NLRA contains an exhaustion requirement that generally divests a reviewing court of jurisdiction to hear arguments that were not made before the Board. National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e). This would jurisdictionally bar us from considering the argument by RELCO unless there were "extraordinary circumstances," Id. We examine each jurisdictional issue in turn.

1.

We have not directly decided whether a challenge to the NLRB's quorum is jurisdictional in nature. The Supreme Court, the D.C. Circuit, and the Sixth Circuit, however, have all characterized appointments clause challenges as nonjurisdictional. See Freytag v. Commissioner, 501 U.S. 868, 878 (1990); Intercollegiate Broad. Sys. v. Copyright Royalty Bd., 574 F.3d 748, 756 (D.C. Cir. 2009) (per curiam); GGNSC Springfield v. NLRB, __ F.3d __, 2013 WL 3305740, at *2–3 (6th Cir. July 2, 2013). But see New Vista, 719 F.3d at 210–13. Seeking to evade these cases, RELCO makes two arguments. First, it asserts that both Freytag and Intercollegiate dealt with challenges to appointments which were not made under the recess appointments clause. This is true, but RELCO provides no argument for why that distinction is legally significant. We decline to attach the "drastic consequences" of terming a recess appointments clause challenge to be "jurisdictional" when it appears closely analogous to claims which the Supreme Court has already decisively declared to be nonjurisdictional. See Gonzalez v. Thaler, 132 S.Ct. 641, 648 (2012).

Second, RELCO argues that we have implied that an appointments clause challenge would be jurisdictional. In Osthus v. Whitesell Corp., 639 F.3d 841 (8th Cir. 2011), we considered a challenge to the NLRB's delegation of authority to its

-45-

general counsel. That delegation was effective when made while the NLRB still possessed a quorum, but according to Whitesell that authority lapsed when the Board later lost its quorum. Id. at 844. Whitesell contended that as a result the district court lacked subject matter jurisdiction. We disagreed, concluding that the delegation was still valid even after the Board ceased to have a quorum and thus the district court continued to have subject matter jurisdiction. Id. RELCO argues that Whitesell implied that if the delegation had not survived the loss of a quorum, it would have deprived the reviewing court of subject matter jurisdiction, and that therefore its challenge is jurisdictional. Whitesell did not need to address or decide the issue as presented by RELCO, however, and RELCO's argument is only speculative. We decline to adopt a position in conflict with Freytag on the basis of speculation.

Though not raised by RELCO, the Third Circuit's New Vista decision addressed another point to distinguish Freytag and Intercollegiate in an effort to characterize a particular appointments clause challenge as jurisdictional. The New Vista court decided that Freytag and Intercollegiate only held that appointments clause challenges "are nonjurisdictional when brought independently." 719 F.3d at 213. It concluded in contrast that an appointments clause challenge which "goes directly to the Board's power to hear a case" is jurisdictional and may be brought at any time. Id. (quotation omitted). We are not persuaded by this theory, however. First of all, the Third Circuit had precedent postdating Freytag stating that "the overall authority of the Board to hear [a] case under the NLRA" was jurisdictional in nature. NLRB v. Konig, 79 F.3d 354, 360 (3d Cir. 1996). The New Vista inquiry was limited to whether the Supreme Court's stated desire to "bring some discipline" to the term jurisdictional would require a reassessment of Konig. New Vista, 719 F.3d at 210–11 (quoting Thaler, 132 S.Ct. at 648)). Our court has no analogue to Konig, and we should give Freytag its most natural reading.

More importantly, the Third Circuit's analysis does not actually distinguish either Freytag or Intercollegiate. In Freytag, the Supreme Court was quite explicit that

-46-

the "alleged defect in the appointment of the Special Trial Judge goes to the validity of the Tax Court proceeding that is the basis for this litigation." 501 U.S. at 879. It nonetheless declined to characterize that challenge as jurisdictional. While the alleged appointments clause violation would have been a "structural defect" in the Tax Court proceeding, the existence of a structural defect does not necessarily cause a reviewing court to lack subject matter jurisdiction, and it thus did not convert the challenge into a jurisdictional one. Id. at 897–98 (Scalia, J., concurring in part and concurring in the judgment). Indeed, the Court has been quite consistent in holding that the invalidity of an agency official's appointment is not a jurisdictional defect even where, if timely raised, it would compel a reversal. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952).

Intercollegiate also squarely rejected the jurisdictional appointments clause challenge in large part because such challenges would have the "far-reaching consequence[]" of invalidating huge swaths of copyright law. 574 F.3d at 756. The D.C. Circuit noted that the appointments clause issue there could have invalidated not only the status of the Copyright Royalty Board whose decision was under review, but also "call into question the status of every registered American copyright." Id. The court considered this prospect as a reason to reject hearing the belated challenge, not as a reason to view it as jurisdictional.

We see no reason to depart from Freytag's general rule that appointments clause challenges are nonjurisdictional. Since our jurisdiction to hear these cases is not impaired, we turn now to see whether any "extraordinary circumstances" allow us to hear RELCO's belated challenge to the NLRB's recess appointments. See 29 U.S.C. § 160(e).

2.

RELCO did not make its appointments clause challenge before the NLRB or in its initial briefs on appeal. We will generally not consider an argument that was not made in a party's opening briefs and was only raised in a Rule 28(j) letter. Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers, 501 F.3d 912, 914 n.3 (8th Cir. 2007). This rule is normally discretionary, and Freytag indicates that a reviewing court generally is permitted (though not obliged) to hear a belated appointments clause challenge. The NLRA contains its own jurisdictional bar, however, foreclosing judicial consideration of any argument not presented before the Board unless "extraordinary circumstances" are present. 29 U.S.C. § 160(e). See St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 848 (8th Cir. 2006).

RELCO first attempts to argue that it did not waive its appointments clause challenge, for it raised the issue only a few weeks after Noel Canning was decided. RELCO asserts that it had no way of anticipating "the relatively arcane constitutional grounds" that led to the decision in Noel Canning, and complains that it cannot be asked to "raise (or risk waiving) every potential legal argument, no matter how novel and lacking in legal support." Resp. Supp. Br. at 11–12.

The waiver doctrine requires a party to make each argument it wishes to preserve for appeal in a timely fashion before the original decisionmaker. See Hulsey v. Astrue, 622 F.3d 917, 924 (8th Cir. 2010). Nothing about this case indicates we should deviate from this rule. All of the facts and legal arguments necessary to make an appointments clause challenge were available to RELCO when its case was heard by the Board. RELCO was aware that the NLRB's quorum included recess appointees, and it was aware of when and by what means those members were appointed. Indeed, according to RELCO the legal argument has been available since the 1789 ratification of the Constitution. The fact that RELCO initially decided not to pursue this argument because it viewed it as "arcane," "novel," and "lacking in legal support" is a strategic decision whose consequences it must accept.

-48-

The decision in Spiegla v. Hull, 481 F.3d 961 (7th Cir. 2007), on which RELCO relies, grew out of circumstances not present here. In Spiegla, a party did not raise an argument which had been specifically rejected by a Seventh Circuit panel in an earlier appeal. Id. at 964. The Seventh Circuit allowed the party to raise the issue later because an intervening Supreme Court decision had called the earlier panel opinion into question. Id. Here by contrast, there was no binding precedent which would have foreclosed RELCO's appointments clause challenge. Noel Canning itself is not binding on us and did not change the state of the law in this circuit.

The final question for jurisdictional purposes is whether "extraordinary circumstances" exist which permit us to hear RELCO's challenge. 29 U.S.C. § 160(e). RELCO argues that extraordinary circumstances are present because if the Board was not properly constituted, then any order it issues would be automatically void. It relies on the Supreme Court's statement in NLRB v. Cheney California Lumber Co. that "if the Board has patently traveled outside the orbit of its authority" then "there is, legally speaking, no order to enforce." 327 U.S. 385, 388 (1946). This was the rationale relied upon by Noel Canning, which held that extraordinary circumstances exist that allowed the appointments clause challenge to proceed notwithstanding § 160(e)'s exhaustion requirement. 705 F.3d at 497–98.

We have identified only two situations that qualify as "extraordinary circumstances" under § 160(e). In NLRB v. International Brotherhood of Teamsters, 225 F.2d 343 (8th Cir. 1955), we indicated that one such circumstance would be if the Board's decision were "nakedly void under the statute." Id. at 346. This would heed Cheney's admonition that a decision "patently . . . outside the orbit" of the Board's authority is automatically unenforceable. 327 U.S. at 388. The second possible "extraordinary circumstance" is when a new development of fact or law occurs after the Board's decision or was otherwise unavailable to the party at the original hearing. See Monark Boat Co. v. NLRB, 708 F.2d 1322, 1725 (8th Cir. 1983) (assuming

-49-

without deciding that previously unavailable evidence created extraordinary circumstances, but finding that the new evidence still did not establish the Board abused its discretion).

Neither such extraordinary circumstance exists in this case. There was no change in facts or law which altered the availability of RELCO's appointments clause challenge. As noted, Noel Canning did not alter the law in this circuit. All the relevant facts and constitutional clauses were known to RELCO at the time of its Board hearing, and it was a tactical decision on its part not to press what it concedes appeared to be a "novel [argument] lacking in legal support."

Nor was the Board's decision "patently . . . outside the orbit of its authority." Cheney, 327 U.S. at 388. Noel Canning relied heavily on Carroll College, Inc. v. NLRB, 558 F.3d 568 (D.C. Cir. 2009). In the latter case, the D.C. Circuit had permitted an otherwise waived argument to be heard after the Board had ordered a religious college to engage in collective bargaining. Id. at 574. The court held that the NLRB should have known at the time of its initial decision that such an order was clearly beyond its authority to act based on unambiguous circuit precedent. Id. Consequently, the court considered and relied upon the belated argument of the college that the NLRB had acted beyond its authority. Of critical importance was the status of the college as a religious institution protected by the First Amendment, which was an example of the type of case Cheney had in mind as being "patently . . . outside the orbit of [the Board's] authority." Cheney, 327 U.S. at 388. In Carroll College, the court permitted the college to make its belated argument that the NLRB acted beyond its authority because the Board "should have known immediately that the college was entitled to a . . . exemption from the NLRA's collective bargaining requirements." 558 F.3d at 574.

In the cases now before our court, by contrast, the validity of the Board's composition at the time of the RELCO decisions was supported by three appellate

-50-

court decisions spanning over forty years. See Evans v. Stephens, 387 F.3d 1220 (11th Cir. 2004) (en banc) (rejecting both the argument that intrasession recesses are not recesses and that the filled seat must have become vacant during the recess when the appointment was made); United States v. Woodley, 751 F.2d 1008 (9th Cir. 1985) (en banc) (addressing and rejecting only the latter argument); United States v. Allocco, 305 F.2d 704 (2d Cir. 1962) (same). The argument in opposition relies on what even RELCO admits is an "arcane" constitutional argument not accepted by any court until 2013. In such circumstances, the Board's decision was not obviously or clearly beyond its authority such that it "should have known immediately" that it lacked the authority to issue the order. Carroll College, 558 F.3d at 574; see also NLRB v. Newton-New Haven Co., 506 F.2d 1035, 1038 n.2 (2d Cir. 1974) (waiving an untimely appointments clause challenge to the NLRB because the Board at the time of its decision had at least arguable reason to believe that its practices were legal).

While Noel Canning also justified its finding of "extraordinary circumstances" on the theory that the alleged lack of a quorum "raise[s] questions that go to the very power of the Board to act and implicate fundamental separation of powers concerns," 705 F.3d at 497, several circuit courts have previously concluded that a challenge to the legal composition of an agency is an affirmative defense that can be waived if it is not timely raised. See, e.g., In re DBC, 545 F.3d 1373, 1380 (Fed. Cir. 2008); Newton-New Haven, 506 F.2d at 1038. In Newton-New Haven, the Second Circuit considered a challenge to an NLRB decision made by a panel consisting of one Board member and two staff attorneys. After the board's decision, but before the completion of the company's appeal, the court ruled in a separate case that the panel composition was impermissible under the NLRA. KFC Nat'l Mgmt. Corp. v. NLRB, 497 F.2d 298 (2d. Cir. 1974). The court nonetheless refused to excuse the company's waiver of the issue. Newton-New Haven, 506 F.2d at 1038.

Constitutional considerations, no matter how important or "fundamental," can be forfeited as Justice Scalia has emphasized: "Appointments Clause claims, and other

structural constitutional claims, have no special entitlement to review." <u>Freytag</u>, 501 U.S. at 893 (Scalia, J., concurring in part and concurring in the judgment). This principle is particularly important when deciding whether to circumvent an explicit jurisdictional exhaustion requirement like that which is contained in the NLRA. <u>See</u> 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

We conclude that RELCO waived its challenge to the Board's composition because it did not raise the issue before the Board, and therefore 29 U.S.C. § 160(e) bars us from considering the issue.[8] Further, because the Board's decision was not "patently . . . outside the orbit" of the Board's authority, <u>Cheney</u>, 327 U.S. at 388, nor were there any new developments of fact or law unavailable to RELCO during the original Board hearing, <u>see</u> <u>Monark</u>, 708 F.2d at 1725, this case does not present the "extraordinary circumstances" required for us to reach this unpreserved argument. We therefore decline to disturb the Board's decision on the basis of RELCO's appointments clause challenge.

---

[8] The dissent would nullify the appointments on the grounds that the "vacancies predated the recess periods during which they were filled" and thus did not "happen during the Recess of the Senate." <u>Post</u> at 53. Since we have concluded that RELCO waived this issue, we do not decide this issue today. It is noteworthy, however, that the Board's position on this question has continuous support in the historical record dating back to the early 19th century. <u>See, e.g.</u>, 1 Op. Att'y Gen. 631 (1823) (A.G. Wirt) (rejecting the position urged by RELCO); 10 Op. Att'y Gen. 356 (1862) (A.G. Bates). (declaring the issue "settled . . . by the continued practice" of previous attorneys general and the general "acquiescence of the Senate."); <u>In re Farrow</u>, 3 F. 112, 115 (C.C. N.D. Ga. 1880) (Woods, J.) (concluding that the question had been "exhaust[ed]" by unbroken historical practice).

III.

The Board's decisions in both <u>RELCO I</u> and <u>RELCO II</u> were supported by substantial evidence. RELCO's challenge to the National Labor Relations Board's composition should not be addressed because it is barred by 29 U.S.C. § 160(e)'s jurisdictional exhaustion requirement. We therefore grant the Board's application for enforcement and deny RELCO's petition for review.

SMITH, Circuit Judge, dissenting.

I respectfully dissent because I conclude that the Board lacked a quorum due to the invalidity of the recess appointments of three of its members. I would follow the holding in *Noel Canning* that the recess appointments clause of the Constitution permits the President to fill only "Vacancies that may happen during the Recess of the Senate." 705 F.3d at 507 (quoting U.S. Const. art II, § 2, cl. 3). It is undisputed that the appointments of three of the five Board members occurred during Senate recesses, whether they be characterized as intersession or intrasession recesses. However, it is also undisputed that the vacancies filled by these recess appointments did not "happen during the Recess of the Senate" as the words "happen during" are normally used in the English language.[9] The vacancies predated the recess periods during which they

_____

[9]I agree with the dissent in the Eleventh Circuit's *Evans* case, which stated:

By interpreting the Recess Appointments Clause to allow a President to fill a vacancy created during one recess with an appointment made during a subsequent recess, we are effectively allowing a President to side-step the Senate's advice-and-consent role even where the Senate is *not* disabled from fulfilling that role— which, I note again at the risk of repetition, was and still is the only reason for creating a recess appointment power.

-53-

were filled.[10] I would therefore vacate the decisions of the Board which lacked a quorum of duly-appointed members.[11]

The majority declines to review RELCO's argument regarding the validity of the recess appointments. It concludes that RELCO's challenge is not jurisdictional and waived because it was not raised before the Board or in its initial briefs. I agree with the majority that RELCO's brief did not make a cognizable jurisdictional argument under the applicable authorities. However, I disagree that RELCO has not made a sufficient showing that its nonjurisdictional Appointments-Clause challenge lacks extraordinary circumstances warranting discretionary review on our part. In *Freytag*, the Court rejected the argument of the IRS Commissioner that the petitioners had waived their right to challenge the constitutionality of a section of the tax code. 501 U.S. at 879. The Court stated that it had discretion to hear the case and would do so

> I do not believe that the Constitution permits a President to frustrate in this way the careful separation of powers intended by the framers.

387 F.3d at 1234 (11th Cir. 2004) (Barkett, J., dissenting)

[10]The majority seems to consider "continued practice" sufficient authority for ignoring the plain language of the Constitution. In my view, congressional acquiescence to the exercise of executive power not authorized by the Constitution does not amend the Constitution to create what did not exist. The People gave limited authority to our federal government divided among three branches, delineating that authority in specific Constitutional provisions. Two branches of that government cannot collude to give one of them governmental power that the People did not first place in the Constitution.

[11]As noted by the majority, the Third and Fourth Circuits have held that the recess appointments of three members of the NLRB caused the Board to lack a quorum. *See New Vista Nursing & Rehab.*, 719 F.3d at 244; *Enter. Leasing Co. Sys.*, 2013 WL 3722388 at *48.

because the challenge of the statute was "neither frivolous nor disingenuous."*Id.* The Court also noted that the challenged feature of the statute "goes to the validity of the Tax Court proceeding that is the basis for this litigation." *Id.* RELCO's challenge to existence of a quorum on the Board similarly goes to the very validity of the underlying proceeding.

In short, the majority reiterated the questions facing our court to be those that we posed to the parties for supplemental briefing. Those questions were:

> 1) Whether the challenge to the NLRB's quorum is jurisdictional?
> 2) If it is not jurisdictional, did RELCO waive the issue?
> 3) If it was waived, should we nonetheless decide the issue?
> 4) Assuming we can decide the issue, were the appointments to the NLRB validly made in accordance with the Recess Appointments Clause?

Based on this record and the applicable authorities, I would answer these questions as follows: (1) No., (2) No., (3) Yes., and (4) No. I therefore respectfully dissent.

_____