# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2523
No. 99-2916

_____

| | | |
|---|---|---|
| Carleton College, | * | |
| | * | |
| Petitioner/Respondent, | * | |
| | * | |
| v. | * | On Petition For Review of an Order |
| | * | of the National Labor Relations Board. |
| National Labor Relations Board, | * | |
| | * | |
| Respondent/Petitioner. | * | |

_____

Submitted: June 14, 2000

Filed: October 24, 2000
_____

Before LOKEN, BRIGHT, and ROSS, Circuit Judges.
_____

ROSS, Circuit Judge.

Carleton College petitions for review of a decision and order of the National Labor Relations Board (Board); the Board cross-petitions for enforcement of its order. We grant the petition for review and deny enforcement of the order.

## BACKGROUND

Carleton is a small liberal arts college. The music department offers classroom courses in music theory, history, and composition that are taught by full-time tenure-

track faculty.  The department also offers lessons in instrumental and vocal performance that are taught by part-time adjunct instructors, who work in the applied music program under one-year contracts.  In spring 1995, adjunct instructors, Karl Diekman, Eric Kodner, and Lynn Deichert, formed an ad hoc committee, which distributed a survey to the adjunct music instructors concerning salary, benefits, and other issues relating to them.  On June 1, Diekman, Kodner, and Deichert met with Lawrence Archbold, then-chairman of the music department, and Stephen Kelly, department co-chair, and presented the survey results.  At the end of the meeting, they informed Kelly of their intention to hold elections in the fall for a formal committee.  On September 28, 1995, they distributed ballots to the adjunct music faculty for election of five members to The Adjunct Faculty Committee (TAFC).  In addition to Diekman, Kodner, and Deichert, Jim Hamilton and Elizabeth Erickson were elected.

Also, in September 1995, Archbold and Kelly informed the music faculty that the department intended to form a committee consisting of tenure-track and adjunct faculty to address issues related to the applied music program.  In early October 1995, Kelly and Archbold distributed ballots to the adjunct faculty for election of members to the Adjunct Faculty Concerns Committee (AFCC).  In an October 26 memo, Kelly informed the adjunct faculty of the results of the AFCC election, noting that the department was unaware that "a small group" of adjunct faculty had run a "simultaneous" election for their own committee.  In addition, he stated that AFCC was the only "Departmental committee for adjunct faculty concerns."

In an October 30 memo to Kelly, Diekman, Deichert, Kodner, and Hamilton, listed as members of TAFC, expressed surprise that he was unaware of the TAFC election since he had been informed about it at the June 1 meeting.  In early March 1996, Diekman, Kodner, and Deichert met with Kelly, who was then department chair, and Archbold, who was then director of the applied music program, and presented TAFC's written agenda.  Several days later, at the suggestion of Charles Carlin, a chemistry professor, Diekman, Kodner, and Deichert submitted a memo dated February

27, 1996 to the Faculty Affairs Committee (FAC) concerning TAFC. Kelly then wrote the dean of the college, Elizabeth McKinsey, that although the memo contained some good suggestions, it also contained much misinformation. In late April, Kodner and Diekman met with the FAC, which agreed that TAFC should be recognized and treated like any other college committee.

In July 1996, Kelly recommended that McKinsey take disciplinary action against Kodner, Deichert, and Diekman for "unacceptable performance." As to Deichert, Kelly cited two grounds -- that the October 30, 1995 memo had affixed Hamilton's name without his consent and that the February 26, 1996 memo distributed to the FAC contained misrepresentations. As to Kodner, Kelly cited the two grounds and alleged that Kodner had complained to students about the department. As to Diekman, in addition to the two grounds relating to TAFC, Kelly alleged that Diekman had complained to students about the department, had threatened to withhold grades until he received a reimbursement, and had threatened the future employment of Hector Valdivia, a tenure-track music professor. McKinsey rejected Kelly's recommendations for discipline, but set up individual meetings with the three to discuss professional expectations before extending contracts for the 1996-97 academic year. After the meetings, McKinsey offered contracts to Kodner and Deichert. Although she also intended to offer Diekman a contract and even had one to offer him at the meeting, she did not do so.

On September 9, 1996, McKinsey wrote Diekman that in light of his conduct at the September 5 meeting she had decided not to offer him a contract for the upcoming year, stating he had displayed a negative attitude and a lack of commitment to act in a professional manner. For example, McKinsey noted that he had described the music department as a "laughingstock" and a "pig." She also noted he was unwilling to agree to act in a professional manner, expressed loyalty only to adjunct faculty and students, and indicated he did not need a job at Carleton.

Diekman then filed a complaint with the NLRB. After a hearing, an administrative law judge (ALJ) found that Carleton's refusal to extend Diekman a contract for the 1996-97 academic year was an unfair labor practice, in violation of sections 8(a)(3) and (1) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(3) and (1). Citing Wright Line v. NLRB, 251 N.L.R.B. 1083, enforced, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982), the ALJ found that Diekman's involvement with TAFC was a protected activity, Carleton had an animus towards TAFC, acted upon that animus in refusing to extend Diekman a contract, and, absent the animus, Carleton would have extended Diekman a contract, reasoning the non-TAFC related grounds of misconduct Kelly had relied on were pretextual.

The ALJ did not find that the reasons cited in McKinsey's letter were pretextual. To the contrary, he found that at the meeting Diekman had been rude and insubordinate, used "off-color" language, and was unwilling to commit to act in a professional manner, noting ordinarily such conduct could provide a defense under Wright Line. However, the ALJ found that Diekman's conduct could not because it occurred in the context of protected activity and was protected under the Act, citing Earle Indus. v. NLRB, 75 F.3d 400, 405-07 (8th Cir. 1996). The ALJ noted that an employer must sometimes tolerate rude and insubordinate behavior in the course of labor matters. He also believed that Diekman's unwillingness to agree to McKinsey's demands to act professionally did not render him unfit for employment since McKinsey's requests were in fact demands to abandon TAFC activity. The Board adopted the ALJ's findings and ordered Carleton to reinstate Diekman. Carleton College, 328 N.L.R.B. 31, 1999 WL 298524 (1999).

## DISCUSSION

"We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Town & Country Elect., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). "'Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Mississippi Transport, Inc. v. NLRB, 33 F.3d 972, 977 (8th Cir. 1994) (quoting GSX Corp. v. NLRB, 918 F.2d 1351, 1356 (8th Cir. 1990)).  Under the substantial evidence test, however, we must take into account evidence that detracts from the Board's decision and "'must view the inherent strengths and weaknesses of the inferences drawn by the Board.'"  GSX Corp., 918 F.2d at 1357 (quoting NLRB v. American Postal Workers Union, 618 F.2d 1249, 1254 (8th Cir. 1980)).  In addition, we have recently made clear that "an ALJ's credibility determinations are considered with the rest of the NLRB's factual findings under the general substantial evidence test."  Town & Country, 106 F.3d at 819.

With this standard in mind, we turn to the arguments.  Under the Wright Line analysis, "the General Counsel [must] make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision."  Pace Indus., Inc. v. NLRB, 118 F.3d 585, 590 (8th Cir. 1997) (internal quotation omitted), cert. denied , 523 U.S. 1020 (1998).  "The burden is then on the employer, which can exonerate itself by showing that it would have [made the decision] for a legitimate, nondiscriminatory reason regardless of the employee's protected activity."  Earle Indus., Inc. v. NLRB, 75 F.3d 400, 404 (8th Cir. 1996).  Carleton argues that the General Counsel failed to make a prima facie showing that in failing to renew Diekman's contract it was motivated by an animus towards his involvement in TAFC.   Although Carleton asserts that there was insufficient evidence of its animus towards TAFC,  for purposes of this opinion, we will assume that Kelly was motivated by an animus towards TAFC and his animus was attributable to Carleton.  However, that is not enough.  "While hostility to [a] union is a proper and highly significant factor for the Board to consider when assessing whether the employer's motive was discriminatory, . . . general hostility toward the union does not itself supply the element of unlawful motive."  GSX Corp., 918 F.2d at 1357.  Rather, the General Counsel had to offer proof that Carleton acted on that animus in refusing to extend Diekman's contract.

We agree with Carleton that even if Kelly had acted on an animus by recommending disciplinary action against the three TAFC activists, that does not show Carleton's unlawful motivation. It is undisputed that McKinsey, who had the sole authority to take disciplinary action, rejected his recommendations. The adverse action at issue is McKinsey's decision not to offer Diekman a contract. As to her motivation, the Board believed that she had used the meetings as a "club" to force the three activists into abandoning their TAFC activities. 1999 WL 298524, at \*75. It also believed that a reasonable employee would have understood her requests to act in a professional manner as demands to forego protected activity, finding that she had deliberately phrased her demands in "generalities" to secure the activists' acquiescence in abandoning TAFC activity without saying so. Id. at \*79. In support, the Board stated that Deichert and Kodner received contracts only because they "knuckled under" to McKinsey's demands to forego protected activity. Id. at \*81. Our review of the record fails to disclose substantial evidence in support of these findings and inferences. Indeed, other than the fact that Deichert received a contract, there is no evidence at all regarding his meeting with McKinsey.

As to Kodner, not only does the evidence fail to support the Board's findings, it contradicts them. Instead of "knuckling under" to demands to forego TAFC activity, Kodner stood firm in discussing TAFC matters. For example, after McKinsey told Kodner that the February 26 memo contained inflammatory and unsubstantiated statements and asked if he would retract anything in it, Kodner refused, stating the memo was carefully drafted. As to the October 30 memo, he testified he had telephoned Hamilton about the memo and offered to produce telephone records in support. Kodner also told McKinsey it was a "pity" that she didn't have a dialogue before the meeting to discuss TAFC issues. When McKinsey first asked about his commitment to professional behavior, Kodner told her that he was concerned about Carleton's "professional behavior" and threatened a lawsuit. However, Kodner testified that McKinsey had "spelled out" her expectations regarding professional behavior. He agreed that faculty members should not complain to students about the department or interfere with tenure

decisions and had assured McKinsey he had not done so and would not do so. Although McKinsey was satisfied that Kodner was committed to acting in a professional manner, they did not agree on everything. To the contrary, they agreed to disagree on certain issues. Kodner understood the agreement to mean that Carleton and TAFC could have different opinions about adjunct issues and that he was free to complain, state concerns, and pursue interests.

In addition, Carlin, who at Diekman's request attended his meeting as an "outside observer," testified that he did not feel Diekman was being "set up" or that Carleton was looking for an excuse to get rid of him. Rather, Carlin testified that the meeting was fair and, based on Diekman's conduct at the meeting, understood McKinsey's decision not to renew his contract. Carlin explained that "any college environment is based on mutual trust and respect, [which is] called collegiality and [which is] essential to [Carleton's] well-being as an institution."

Even Diekman's testimony does not support the Board's findings and inferences. Although the Board found that McKinsey's meetings with the adjuncts were "unprecedented," id. at *71, Diekman acknowledged that it was appropriate for McKinsey to speak to a faculty member if she had reason to believe that he had not acted in a professional manner and to demand a "commitment that [he] would act in a professional manner going forward."[1] Diekman agreed that it would be unprofessional for a faculty member to complain to students about the department, attempt to interfere with a tenure decision, and make derogatory comments about another faculty member. He also conceded that the February 26 memo contained "cheap shots," which he defined as "anything to denigrate somebody." Diekman explained that acting in a professional manner required that faculty members show each other mutual respect and that mutual respect was essential to Carleton's mission to provide a high quality education to its

---

[1]It is undisputed that two faculty members told McKinsey that Diekman had threatened to undermine Valdivia's tenure review.

students.  In fact, Diekman admitted that he had filed a written complaint that Valdivia had failed to treat him with respect, but had not sought disciplinary action.  Rather, because, in the words of the complaint, "mutual respect . . . is essential in any music department," Diekman only sought an assurance that Valdivia would treat him in a professional manner in the future.  Indeed, Diekman testified that any instructor who would not make such an assurance did not deserve to be a member of Carleton's faculty.

As to his meeting with McKinsey, Diekman testified the he understood the purpose was to "iron things out."   Although he may not have known that a contract had been brought to the meeting, Diekman believed McKinsey's intention at the outset was to offer him one following the meeting.  As to his behavior at the meeting, Diekman acknowledged he had been sarcastic, used vulgarities, called the department a "laughingstock" and a "pig," "sort of" evaded McKinsey's requests for a commitment to abide by professional expectations, and expressed loyalty only to adjunct faculty and students.

Although the Board "is permitted to draw reasonable inferences, and to choose between fairly conflicting views of the evidence[,] [i]t cannot rely on suspicion, surmise, implications, or plainly incredible evidence."  Concepts & Designs, Inc. v. NLRB, 101 F.3d 1243, 1245 (8th Cir. 1996) (internal quotation omitted).  As a reviewing court, we have "'the right and duty to reject a conclusion of the Board that disregards or fails to give proper cognizance of uncontradicted or well-established facts.'"  GSX Corp., 918 F.2d at 1360 (quoting NLRB v. Winona Textile Mills, Inc.,160 F.2d 201, 208 (8th Cir. 1947)).  In this case, the Board's finding of unlawful motivation is based on nothing more than surmise.  The only reasonable inference from the evidence is that McKinsey's decision was not based on Diekman's past or future involvement with TAFC, but was based on his behavior at the meeting, which demonstrated a lack of respect and commitment to the music department.

Even if the General Counsel had made a prima facie showing of unlawful motivation, we agree with Carleton that Diekman's behavior at the meeting provided legitimate reasons for the nonrenewal of his contract. Although the Board found that Diekman's behavior was rude and insubordinate, it believed that Carleton could not rely on it as a defense under Wright Line because if not for Kelly's animus McKinsey would not have met with Diekman. 1999 WL 298524, at *77. For the same reason, the Board believed that Diekman's behavior at the meeting was connected to his involvement with TAFC. Although the Board recognized that "not every act in support of . . . unionization by an employee is protected by the law," NMC Finishing v. NLRB, 101 F.3d 528, 530 (8th Cir. 1996), it held that Diekman's behavior was protected under the Act. 1999 WL 298524, at *79. In so deciding, the Board relied on Earle Indus., 75 F.3d at 405-07, in which this court set forth factors the Board must consider in determining whether misconduct occurring in connection with protected activity is also protected. Carleton argues that Diekman's behavior at the meeting was not "concerted activit[y] for the purpose of . . . mutual aid or protection," 29 U.S.C. § 157, and thus it could not be protected. Although we are inclined to agree with Carleton, we need not decide the issue. Assuming the Earle Indus. standard is applicable, the Board's application of the standard was "misguided." Earle Indus., 75 F.3d at 407.

In Earle Indus., the Board found that an employer had committed an unfair labor practice by firing a union advocate. The Board did not dispute that the employee had lied and been insubordinate during a union organizing campaign and in the subsequent investigation of her misconduct. However, it found because the initial misconduct occurred during a union campaign and her subsequent misconduct was precipitated by the company's improper questions, the lies and insubordination fell "into a class of protected misbehavior or 'leeway,' which [is] a necessary accommodation of the realities of industrial life." Id. at 404. We refused to enforce the order, stating "[t]he Board's conception of 'leeway' for misconduct is far too blunt an instrument when applied without regard to the situation in which the misconduct took place. " Id. at 405.

We noted that misconduct that is "flagrant or render[s] the employee unfit for employment" is unprotected.  Id. at 406.  In determining whether misconduct occurring in connection with protected activity is protected under the Act, we instructed the Board to take into account the nature of the misconduct, the nature of the workplace, and the effect of the misconduct on an employer's authority in the workplace.  Id. at 406-07; see also NMC Finishing, 101 F.3d at 532 (Board must balance employee's rights under Act "against an employer's business interests").  In other words, "the context of the misconduct [i]s the key to deciding whether the misconduct [i]s protected by the Act."  Earle Indus., 75 F.3d at 406.  In Earle Indus., we held that the relevant factors weighed against protection.  We noted that although the employee's initial misconduct occurred during a union campaign, it took place on a factory floor, not in a grievance or bargaining session "where the [Act] frees the worker from subordination the employer otherwise has the right to insist on."  Id. at 407.  We also noted that the employee had deliberately violated legitimate workplace rules and in so doing undermined the employer's authority.  Id.  In short, we did not enforce the Board's decision because it "simply d[id] not consider the employer's interest in maintaining discipline."  Id.

Likewise, in this case, the Board's "decision simply does not consider" Carleton's interest in fostering and maintaining mutual respect among faculty, which is, as all witnesses recognized, not only a legitimate academic interest, but a necessary one. Indeed, in NLRB v. Yeshiva Univ., 444 U.S. 672, 680 (1980), the Supreme Court recognized the importance of collegiality to academic institutions.  The Court explained that "[t]he 'business' of a university is education, and its vitality ultimately must depend on academic policies that largely are formulated and generally are implemented by faculty governance decisions."  Id. at 688.  Because "[t]he Act was intended to accommodate the type of management-employee relations that prevail in the pyramidal hierarchies of private industry," id. at 680, and not the structure of a university or college, the Court cautioned the Board that "principles developed for use in the industrial setting cannot be imposed blindly on the academic world."  Id. at 681 (internal quotation omitted).

The Board believed that Diekman's language at the meeting was merely "salty language" that an employer must tolerate in labor matters. 1999 WL 298524, at *78. Perhaps, such language might be excused in a different setting. However, in the context of a meeting with the dean of the college which was called to discuss professional expectations for the future, Diekman's use of vulgarities and description of the music department as a "laughingstock" and a "pig" evidenced his disrespect of the music department and unwillingness to commit to act in a professional manner. In addition, in light of Diekman's understanding that the purpose of the meeting was to "iron things out" and that McKinsey's intention was to offer him a contract, we do not believe that his rude and insubordinate behavior was unlawfully provoked. See Earle Indus., 75 F.3d at 407. Even if Diekman believed that the meeting was due in part to his TAFC activities, Carleton did not have to tolerate his flagrant behavior. "If we hold that the concerted activity gave [Diekman] the license to defy [his] employer, we allow [him] to leverage [his] rights by wrongful conduct." Id. We note that although Kodner stood firm in defense of his TAFC activities, he did not demonstrate a disrespect for the department or refuse to agree to act in a professional manner, as did Diekman.

In addition, contrary to the Board's belief, Diekman's unwillingness to commit to act in a professional manner rendered him unfit for future employment at Carleton. "[T]here can be no doubt that the quest for academic excellence and institutional distinction is a 'policy' to which the administration expects the faculty to adhere, whether it be defined as a professional or an institutional goal." Yeshiva Univ., 444 U.S. at 688. "It is fruitless to ask whether an employee is 'expected to conform' to one goal or another

when the two are essentially the same." Id. Indeed, Diekman acknowledged that a person who refused to commit to act in a professional manner did not deserve to be on the Carleton faculty.

Accordingly, we grant Carleton's petition for review and deny enforcement of the Board's order.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent. Anti-union animus contributed to the discharge decision here, and Carleton College does not satisfy its burden of showing that it would have taken the same action if Diekman had never participated in any of his organizing activities. The Board, thus, correctly found an unfair labor practice by Carleton College.

To establish an unfair labor practice, the general counsel must show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity. See NLRB v. Transportation Management Corp., 462 U.S. 393, 398-99 (1983). In this case, the Board and the administrative law judge did a careful job of analyzing and discussing the evidence. When viewing the College's actions in their entirety, the facts support the conclusion that the College was offering Diekman a choice: either quiet his activities or leave the school. The Board points out that the College's September 9, 1996 letter to Diekman explaining the reasons for his release listed both the February 1996 and the October 1995 TAFC (The Adjunct Faculty Committee) memos as reasons for termination.

The National Labor Relations Act (Act) protects both of these actions. The Board found that TAFC is an admitted labor organization. As circumstantial evidence, the Board points to numerous comments by department faculty, particularly Archbold and Kelly, reflecting animus toward TAFC and, in particular, three of its organizing members,

-12-

Diekman, Deichert, and Kodner. The Board's ultimate conclusion that Diekman did not get a renewal contract to teach, while Deichert and Kodner did, seems indicative that the degree of retreat from demands for union organization demonstrated at the individual meetings with Dean McKinsey played a major role in the decision to discharge Diekman.

The Board drew reasonable inferences from the evidence to support its view that animosity toward Diekman's union activity led to his termination of employment with Carleton College. The majority now draws its own inferences to reject the Board's findings. Thus, the majority of this court has departed from its appropriate review function and endeavors to serve as a super administrative agency when it disagrees with the Board's ultimate findings of fact.

Diekman's language in his individual meeting on September 5, 1996 with McKinsey, that the music department was a "laughingstock" and a "pig" upon which the majority cites as a focus for its decision, may well have been honest and sincere even though salty criticism of a music department which he and other adjunct faculty sought to improve. In the circumstances of that meeting, latitude must be allowed to implement the "congressional intent to encourage free debate on issues dividing labor and management." Linn v. United Plant Guard Workers, 383 U.S. 53, 62 (1966) (footnote omitted).

Additionally, the Board carefully relied on evidence that McKinsey had harbored animus toward at least some of TAFC's statutorily-protected activities. Indeed, she specified as one area of concern, during her meetings with each of the three TAFC supporters, the memorandum which had been sent to the FAC (Faculty Affairs Committee) by TAFC on March 5, 1996. The Board determined that McKinsey had already concluded, by the time of the meeting, that Diekman had engaged in misconduct as reported by faculty and student accusers. Interestingly, the Board noted, none of those incidents of alleged misconduct were documented until after TAFC had submitted its memorandum to the FAC and the record was absent of any prior similar documentation

-13-

pertaining to Diekman during the thirteen years that he worked for the College. In other words, misconduct as a pretext became documented following Diekman's organizational activities.

Earle Indus., Inc. v. NLRB, 75 F.3d 400 (8th Cir. 1996), does not support the majority. In that case, the conduct of the employee was egregious[2] as opposed to Diekman's speaking to Dean McKinsey in a private meeting in a strong and forthright manner to support the right and need to organize adjunct faculty. By discussing the substance of TAFC's February 27 communication to the FAC, the dean had injected herself into the overall bargaining process under the Act. Having done so, the meeting did not fall wholly within the ambit of employee-employer disciplinary discussions.

The decision of the majority in this case makes for a sad day for the rights of teachers in colleges to independently organize and support their rights with strongly held views.

Because Diekman refused to back down in his pro-organization views in the September 5 meeting in the way that his colleagues did, he received no contract. The College only needed one example to keep the adjuncts in line for the future. Diekman was that example.

As a result of this decision, the adjunct faculty of Carleton College and others similarly situated will hesitate to make any waves by attempting organized efforts to

---

[2]The worker, Earley Mae Wallace, was part of a group of employees who assisted and accompanied the Reverend Jesse Jackson in making his way through a part of the plant off-limits to nonemployees. When the personnel manager stopped Jackson, Wallace defied the manager before a crowd of employees and news cameras and did so by means of a false statement. See Earle Indus., Inc. v. NLRB, 75 F.3d at 405 (8th Cir. 1996). The court emphasized the *context* in which the insubordinate, rude conduct arises. Id. at 406-7.

improve their conditions in opposition to the entrenched administrative and regular, tenured faculty.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.