# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3001

_____

Nichols Aluminum, LLC

*Petitioner*

v.

National Labor Relations Board

*Respondent*

_____

No. 14-3202

_____

National Labor Relations Board

*Petitioner*

v.

Nichols Aluminum, LLC

*Respondent*

_____

National Labor Relations Board

_____

Submitted: May 12, 2015
Filed: August 13, 2015

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

Nichols Aluminum, LLC (Nichols) petitions for review of a National Labor Relations Board (Board) order finding Nichols violated Section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3), by discharging union member Bruce Bandy on April 27, 2012, for participating in a strike. The Board seeks enforcement of its order. Having jurisdiction under 29 U.S.C. § 160(e) and (f), we grant the petition for review and deny enforcement.

## I.      BACKGROUND
### A.      Facts

Nichols manufactures aluminum at two plants in Davenport, Iowa: the Nichols Aluminum Casting plant (casting plant) and the Nichols Aluminum Finishing plant (finishing plant). Nichols employed approximately 165 employees at the casting plant. Since at least 1978, Nichols's employees have been represented by the International Brotherhood of Teamsters Union, Local No. 371 (the union).

On January 20, 2012, during negotiations to replace a collective bargaining agreement (CBA) that had expired in November 2011, the union called for a strike. Most of the casting plant employees participated in the strike—although a few crossed the picket line. Nichols hired replacement workers to fill the gap.

Bandy, a 34-year Nichols employee and blending operator at the casting plant, participated in the strike. He worked the picket line once a week but did not take a strategic or leadership role in the union or the strike, nor did he otherwise distinguish himself from the other strikers.

On April 6, 2012, the union ended the strike. Nichols began recalling to work those strikers who had not been permanently replaced, including Bandy. As employees returned, Nichols asked them to take what the parties here describe as a "no-strike pledge." The pledge required employees to say they were returning to work at Nichols and would not "strike again over the same dispute." The pledge notified employees that doing so would subject them "to discipline up to and including the possibility of discharge."

Without objection, Bandy verbally took the pledge when he returned to work on April 11, 2012, but did not sign a written pledge form as some others had done before the union instructed its members to refuse. Nichols maintains the pledge merely confirmed returning employees would not engage in unlawful intermittent striking, which the Board's General Counsel agrees is not protected activity under the Act.

At a post-strike meeting that Bandy attended, Nichols also reviewed and distributed its longstanding "zero tolerance" workplace violence policy, which was incorporated into the CBA. With the help of a PowerPoint presentation, Nichols reminded returning strikers—as well as replacement workers and employees who had crossed the picket lines—that "[h]arassing, disruptive, threatening, and/or violent situations or behavior by anyone, regardless of status, will not be tolerated and" offending employees would be "subject to discharge for the first offense." Nichols posted a version of that notice throughout its plants. The policy provided employees were subject to discharge for, among other things, "[m]aking threatening remarks . . . that constitute a threat against another individual," and "[a]ggressive or hostile behavior that creates a reasonable fear of injury to another person or subjects another individual to emotional distress."

On April 25, 2012, two weeks after his return, Bandy was involved in a confrontation with Keith Braafhart, a finishing plant employee who crossed the picket

line and began working in the casting plant during the strike. Bandy testified his working relationship with Braafhart was "not good" and that Braafhart called him derogatory names from the time they first met.

At the time of the confrontation with Bandy, Braafhart was driving a forklift up a ramp that led to one of the aluminum melders. Bandy, who had recently exited the break room near the ramp, waited for the forklift to pass. Braafhart honked the horn as he was required; however, he may have sounded the horn "a little more" than necessary. When Bandy recognized Braafhart, Bandy drew his thumb across his neck in a "cut throat" gesture that Braafhart construed as a threat. Braafhart testified Bandy looked right at him with a "death stare" from about ten feet away, "gave [him] the mean mug, drew his thumb across his throat at [him] and that was it." Braafhart understood the gesture to mean "I'm going to cut your throat."

After the gesture, Braafhart parked the forklift and asked a nearby witness, Sam Harroun, whether he had seen the gesture. Harroun "chuckled" and said he had seen Bandy. Harroun, who thought Bandy might have been signaling Braafhart to stop "blaring his horn," did not perceive the gesture as a threat. When Braafhart told Bandy, "I'm taking you upstairs," Bandy replied that he was "scratching [his] throat." As Braafhart left to find a supervisor, Bandy chuckled as he told Harroun "his throat itched and that was it."

Braafhart reported the incident to Nichols's management and prepared a written statement. Bandy's supervisor, Vick Hansen, asked Bandy to join him in a meeting with Plant Manager Bill Hebert, Human Resources Vice-President Mike Albee, and a union steward. At the meeting, Bandy denied making any threat, again explaining he was "scratching his throat."[1]

---

[1]At trial, Bandy changed his story, claiming the gesture was an involuntary reaction as he lurched back to avoid the forklift. The presiding administrative law

Albee sent Bandy home, advising him Nichols would be in touch. Bandy gathered his things and left without an escort. Continuing its investigation, Nichols spoke with Harroun, who opined the gesture was not a threat. After discussing the matter with his management team, Hebert decided to discharge Bandy for violating Nichols's "zero tolerance" workplace violence policy. On April 27, 2012, Human Resources Manager Kristy Riley notified Bandy he had been discharged.

### B.     Procedural History

On June 8, 2012, the union filed an unfair labor practices charge with the Board challenging Bandy's termination. The Board's General Counsel issued a complaint alleging Nichols discharged Bandy for participating in the strike, in violation of Section 8(a)(1) and (3) of the Act. On April 8, 2013, after observing the demeanor of the key witnesses at trial and examining the record evidence, the ALJ concluded Nichols did not violate the Act by discharging Bandy after he made a "cut throat" gesture that Braafhart and Nichols "reasonably construed" as a serious threat.[2]

In analyzing Nichols's motive for discharging Bandy, the ALJ rejected the General Counsel's proposal that Bandy's "strike participation alone provide[d] sufficient circumstantial proof upon which to predicate animus." Noting that Bandy participated in the strike with almost all of Nichols's other employees but did not take

---

judge (ALJ) rejected Bandy's "explanation and reenactment" of the lurch as "inconsistent and incredible."

[2]The ALJ evaluated the propriety of Bandy's discharge under "[t]he so called Wright Line analysis[, which] applie[s] when an employer articulates a facially legitimate reason for its termination decision, but that motive is disputed," NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 780 (8th Cir. 2013) (citing Wright Line, 251 NLRB 1083 (1980), approved by NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 397-99, 401-03 (1983), overruled in part on other grounds by Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 277-78 (1994)).

an "unusual, strategic, or significant role during the walkout," the ALJ searched the record for evidence of discriminatory motive. The ALJ found "no background of independent Section 8(a)(1) violations during the period after the strike" nor "any evidence of hostile remarks or actions by [Nichols] since the strike concluded and employees returned to work." Reviewing what the ALJ described as "a mixed bag of Company responses to employee-on-employee confrontations," the ALJ concluded Nichols's prior enforcement of its no-violence policy did not establish that Nichols "engaged in the disparate treatment of Bandy by discharging him for threatening another employee with serious physical injury or worse." Based on its review of the record, the ALJ found insufficient evidence of antiunion animus to support the discrimination charge.

On August 18, 2014, the Board, over a strong dissent, reversed the ALJ's order, concluding Nichols "violated Section 8(a)(3) and (1) of the Act by discharging . . . Bandy." As the General Counsel acknowledges, "The Board adopted many of the findings and rulings of the [ALJ], including the [ALJ]'s witness credibility determinations, but the Board reversed the [ALJ]'s ultimate conclusion." Rejecting the ALJ's determination that the General Counsel had failed to show Nichols discharged Bandy for participating in the strike, the Board, "[c]ontrary to the [ALJ]," stated it found "direct evidence of animus and a sound basis for inferring it." Specifically, the Board concluded the General Counsel had met its burden of showing Bandy's strike activity was a motivating factor in Nichols's decision to discharge him based upon (1) the "no-strike pledge" to which Bandy agreed; (2) "the timing of Bandy's discharge" after the strike; and (3) what the Board saw as Nichols's "disparate treatment of Bandy's conduct" under its disciplinary policy. Deciding Nichols failed to show it would have fired Bandy regardless of his participation in the strike, the Board ordered Bandy reinstated with backpay and other damages.

The dissent sharply criticized the majority for "rely[ing] on scant evidence and inference to put themselves in position to substitute their judgment for [Nichols's] as

to what . . . Bandy did and whether it warranted discharge," citing NLRB v. Blue Bell, Inc., 219 F.2d 796, 798 (5th Cir. 1955). See also Epilepsy Found. of Ne. Ohio v. NLRB, 268 F.3d 1095, 1105 (D.C. Cir. 2001) ("The Board does not have authority to regulate all behavior in the workplace and it cannot function as a ubiquitous 'personnel manager,' supplanting its judgment on how to respond to unprotected, insubordinate behavior for those of an employer. . . . [A]n employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason."). The dissent agreed with the ALJ "that the General Counsel failed to [establish] that animus against protected strike activity motivated the discharge."

The dissent also admonished the Board for "mischaracteriz[ing] the General Counsel's initial Wright Line burden to prove that animus against union or other protected concerted activity motivated an adverse action." Emphasizing (1) the absence of any evidence to "support an inference that animus against [Bandy's] particular strike activity," which was indistinguishable from scores of other strikers, "caused [Nichols] to single him out for reprisal," and (2) the lack of any "apparent connection between the no-strike pledge and Bandy's discharge," the dissent concluded the General Counsel failed to prove the requisite "nexus between Bandy's strike participation and the motivation for his discharge."

## II.    DISCUSSION
### A.    Standard of Review

"We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). "'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" NLRB v. La-Z-Boy Midwest, 390 F.3d 1054, 1058 (8th Cir. 2004) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).

"In considering whether substantial evidence supports the Board's decision, we must take into account 'whatever in the record fairly detracts from its weight,'" NLRB v. MDI Commercial Servs., 175 F.3d 621, 630 (8th Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)), and "'must view the inherent strengths and weaknesses of the inferences drawn by the Board,'" Carleton Coll. v. NLRB, 230 F.3d 1075, 1078 (8th Cir. 2000) (quoting GSX Corp. of Mo. v. NLRB, 918 F.2d 1351, 1357 (8th Cir. 1990)). "'The Board, in reaching its decision, is permitted to draw reasonable inferences, and to choose between fairly conflicting views of the evidence. It cannot rely on suspicion, surmise, implications, or plainly incredible evidence.'" Concepts & Designs, Inc. v. NLRB, 101 F.3d 1243, 1245 (8th Cir. 1996) (quoting Mead & Mount Constr. Co. v. NLRB, 411 F.2d 1154, 1157 (8th Cir. 1969)).

"We examine the Board's findings more critically when, as here, the Board's conclusions are contrary to the ALJ's." Earle Indus., Inc. v. NLRB, 75 F.3d 400, 404 (8th Cir. 1996). "Although the substantial evidence standard still applies, the Board's evidence must be stronger than would be required in a case where it had accepted the ALJ's findings, since the ALJ's opinion is part of the record against which the substantiality of the evidence must be measured." GSX Corp., 918 F.2d at 1356 (internal citations omitted).

### B.    Discriminatory Discharge

Section 8(a)(1) of the Act makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of" their rights to organize, collectively bargain, and engage in similar concerted activities. 29 U.S.C. § 158(a)(1). Section 8(a)(3) prohibits employers from using "discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." Id. at § 158(a)(3). Although an employer violates Section 8(a)(1) and (3) of the Act if it discharges an employee for engaging in protected activities, "employers retain the right to discharge workers for any number of other

reasons unrelated to the employee's union activities." Transp. Mgmt., 462 U.S. at 394.

To establish an unfair labor practice under the Wright Line framework, the Board's General Counsel must prove "that the employee's protected conduct was a substantial or motivating factor in the adverse action." Id. at 401. If, and only if, the General Counsel meets that burden, the burden shifts to the employer to "'exonerate itself by showing that it would have'" taken the same action "'for a legitimate, nondiscriminatory reason regardless of the employee's protected activity.'" Carleton Coll., 230 F.3d at 1078 (quoting Earle Indus., 75 F.3d at 404). This analysis is designed to "protect[] the rights of employees while preserving an employer's right to discharge an employee for a valid cause." NLRB v. Fixtures Mfg. Corp., 669 F.2d 547, 550 (8th Cir. 1982).

In the case at bar, the General Counsel charged Nichols with unlawfully discharging Bandy for participating in the strike. Nichols does not dispute that Bandy participated in protected strike activity and that Nichols was aware of it. Nichols, instead, argues the Board "incorrectly applied the long-established Wright Line standard," improperly relieving the General Counsel of its burden to prove Bandy's protected activity motivated Nichols's decision to terminate him, and "made factual findings that were not supported by substantial evidence." See RELCO Locomotives, 734 F.3d at 780 ("In appraising a challenge to an employee's termination allegedly caused by protected labor activity, the question is whether the employee's termination was motivated by the protected activity."). Reiterating Bandy's unremarkable role in the strike and his ready assent to the pledge, Nichols contends the General Counsel failed to establish the requisite causal connection between Bandy's participation in the strike "and the alleged discriminatory act"—Bandy's discharge. Nichols's points are well taken.

Under Wright Line, "our task in resolving cases alleging violations which turn on motivation is to determine whether a causal relationship existed between employees engaging in union or other protected activities and actions on the part of their employer which detrimentally affect such employees' employment." Wright Line, 251 NLRB at 1089. To prove discriminatory discharge, the General Counsel must establish "'that the employee was discharged for his union activities or membership—that but for his union activities or membership, he would not have been discharged.'" Concepts & Designs, Inc., 101 F.3d at 1245 (quoting Mead & Mount Constr., 411 F.2d at 1157). Simple animus toward the union "is not enough. 'While hostility to [a] union is a proper and highly significant factor for the Board to consider when assessing whether the employer's motive was discriminatory, . . . general hostility toward the union does not itself supply the element of unlawful motive.'" Carleton Coll., 230 F.3d at 1078 (alterations in original) (quoting GSX Corp., 918 F.2d at 1357).

After careful review of the administrative record, we conclude the Board, in reversing the ALJ's decision and finding Nichols violated Section 8(a)(1) and (3) of the Act, misapplied the Wright Line standard and failed to analyze causation properly. Because the Board did not hold the General Counsel to its burden of proving discriminatory animus toward Bandy's "protected conduct was a substantial or motivating factor in" Nichols's decision to discharge him, Transp. Mgmt., 462 U.S. at 401, we are unable to enforce the Board's order. See Multimedia KSDK, Inc. v. NLRB, 303 F.3d 896, 900 (8th Cir. 2002) (en banc).

## III.  CONCLUSION

We grant Nichols's petition for review and set aside the Board's order. The Board's cross-petition for enforcement is denied.

-10-

MELLOY, Circuit Judge, concurring.

I concur with respect to the majority's decision denying enforcement of the Board's order because the Board misapplied the causation element within the Wright Line standard. Our precedent unequivocally requires more than general hostility toward a union to satisfy the element of unlawful motive. Carleton College v. NLRB, 230 F.3d 1075, 1078 (8th Cir. 2000). The Board failed to engage in any meaningful discussion of this requirement. The Board was put on notice, at least by the dissenting Board member, that in the Eighth Circuit the Wright Line analysis requires more than a showing of anti-union animus and protected activity. There must be a nexus between the union activity and the discharge. To be sure, the level of anti-union animus can certainly be considered and is a highly relevant factor in establishing that connection. However, in this case, the Board made no attempt to "connect the dots" between the anti-union animus, Bandy's strike participation, and his ultimate discharge.

The dissent makes a powerful argument for the proposition that, had the Board done the correct analysis, it could show a causal connection. The disparate treatment of Bandy, compared to other non-striking employees as outlined in the dissenting opinion, is extremely troubling. It could very well have provided the substantial evidence that would have allowed this Court to enforce the Board's order had it done the proper analysis. However, as the majority opinion points out, failure to engage in a proper legal analysis precludes our Court from enforcing the order.

Generally, if an agency applies the wrong legal framework or fails to address an argument, we have the authority to remand the case to the agency for further review. See Ademo v. Lynch, Nos. 13–2621, 13–3566, 2015 WL 4568941, at *9 (8th Cir. July 30, 2015) (immigration); Caviness v. Massanari, 250 F.3d 603, 605–606 (8th Cir. 2001) (social security). In Multimedia KSDK, Inc. v. NLRB, 303 F.3d 896, 900 (8th Cir. 2002) (en banc), however, we held that unless the "Board offers an

-11-

alternative theory on which to uphold its decision" or the Board requests a remand, we cannot remand a case to the Board. I write separately to emphasize that, in the absence of this precedent, I would be inclined to remand this case and permit the Board to apply the correct legal framework. A review of the record indicates Nichols may have engaged in more than general anti-union animus. But, as the majority opinion points out, precedent prevents us from remanding this case. Therefore, I concur with the majority opinion and deny enforcement of the Board's order.

MURPHY, Circuit Judge, dissenting.

Because substantial evidence in the record shows that Nichols Aluminum (Nichols) violated Sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act by terminating Bruce Bandy for engaging in the protected conduct of striking, I dissent. Record evidence of the company's animus against striking includes an illegal use of a no strike pledge, disparate enforcement of its stated policy of zero tolerance of violence, and its discriminatory treatment of returning strikers. The Board concluded from such evidence that the General Counsel met his Wright Line burden to show that animus against the workers' strike motivated the illegal termination of Bruce Bandy who participated on the picket line.

The Board was entitled to consider the Nichols no strike pledge as strong evidence of animus against the protected conduct of striking, conduct in which Bandy had participated. Nichols hired replacement workers during the strike and converted 100 of them to permanent status on April 4. When the union ended its strike, Nichols asked returning strikers to agree that they would be subject to discharge if they went "on strike again over the same dispute." As the Board noted, this no strike pledge did not define the term "same dispute" at a time when negotiations on a new contract were still ongoing. Two of the three Board members stated they would have found the no strike pledge unlawful in itself had it been alleged as a separate violation of the Act, and it was "strong evidence of animus toward the protected conduct of striking."

-12-

To condition employment on a promise not to engage in protected activity has been found unlawful, see In re Pratt Towers, Inc., 338 N.L.R.B. 61, 64 (2002), and hostility toward a union is "a proper and highly significant factor for the Board to consider when assessing" whether particular conduct resulted from a discriminatory motive. Carleton Coll. v. NLRB, 230 F.3d 1075, 1078 (8th Cir. 2000) (internal quotation marks omitted).

In addition to Nichols' use of an unlawful no strike pledge, the Board also considered the company's inconsistent application of its zero tolerance policy in favor of non strikers. Two incidents not mentioned by the majority are particularly relevant to the Board's determination that Bandy was terminated for his participation in protected labor activity. Each of the incidents involved replacement workers who had not participated in the strike but who had engaged in similar or more severe conduct than Bandy's gesture. Neither was terminated.

The first incident occurred on May 4, 2012, one week after Bandy's termination. When returning striker Robert Schalk was clocking out, he saw replacement employee Craig Sulzberger grab himself in the crotch and yell "What the fuck are you looking at, you got a fucking problem?" Schalk left the building, but outside he was accosted by Sulzberger who asked him "if [he] thought he was pretty and what his fucking problem was." While Schalk attempted to reach his car, Sulzberger stepped in front of him and continued to curse. Schalk suggested they talk to a supervisor, and Sulzberger responded "that would be fucking fine, let's fucking do it." When they spoke with supervisor Phil McBroom, he asked Schalk "What the fuck do you want me to do about it?" Schalk responded that he thought they were to report such incidents as part of the zero tolerance policy. McBroom told him he "should fucking grow up," and if he were to do anything about it, he would fire both men. After Schalk reported the incident to human resources and plant manger Bill Hebert, Hebert indicated they would investigate. Sulzberger was eventually written

-13-

up for violating the policy, but he was not discharged. In October Schalk resigned, citing a hostile work environment.

In the second incident, replacement worker Sam Harroun made a verbal threat to another employee during a heated conversation about which department was to blame for allowing molten aluminum to cool. After a comment by Harroun was contradicted by another employee, Harroun turned and said "I'm going to take you out back and beat your ass." When a third employee interrupted that Harroun often slept on his shift, Harroun replied "well, you're nothing but a little bitch." A supervisor intervened, and the encounter ended. No further action was taken by supervisors in response to Harroun's threat.

On appeal Nichols claims that Sulzberger and Harroun, the two comparators identified by the General Counsel, both engaged in conduct that was less severe than Bandy's cut throat gesture. The record does not support this claim, however. Harroun, the sole neutral witness, told Nichols during the investigation that he had not perceived Bandy's gesture to be "any threat at all," and he testified that the gesture was commonly used around the plant to shut off or stop something. He had understood the motion to be a signal for Keith Braafhart to stop blaring the forklift's horn. While Bandy denied making any threat, Harroun made an explicit verbal threat and Sulzberger cursed a coworker and physically blocked access to his car. Nevertheless, striker replacements Sulzberger and Harroun were not terminated while Bandy was.

Nichols' treatment of an employee not named as a comparator, Mike McGolthlen, also shows preferential treatment of non strikers. Before the strike, McGolthlen brought a handgun to work which he cleaned and loaded with a clip of bullets. Although he made no explicit threats, a coworker was alarmed and reported him to supervisors. McGolthlen was fired under the company's zero tolerance policy on January 13, 2012, but he was rehired as a replacement employee after the strike

-14-

began, a mere one month later. This rehiring was evidence that Nichols overlooked even severe violations of its reported zero tolerance policy. Nichols raises two other instances in which it fired employees for violating the zero tolerance policy, but both situations involved explicit threats. Before the strike, plant manager Hebert fired employee Ed Fountain for verbally threatening to bring a baseball bat into the office to beat a female human resources representative. After the strike ended, Hebert discharged non striker Roosevelt Smith after he told his supervisor he had weapons in his vehicle and he intended to "shoot him in the gut." The severity of these incidents distinguishes them from Bandy's hand gesture, and neither shows Nichols consistently applied its policy.

Although the majority concludes that the Board improperly analyzed causation under the Wright Line framework, the General Counsel's initial Wright Line burden is simply "to demonstrate that the employee was engaged in protected activity, that the employer knew of this protected activity; and that the termination was motivated by anti-union animus." NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 783 (8th Cir. 2013). The Board applied the proper Wright Line framework, and substantial evidence supports its conclusion that Nichols' "animus toward the recently ended strike motivated [it] to discharge Bandy."

The Supreme Court has explained that our appellate review "may not displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." United Exposition Serv. Co., Inc. v. NLRB, 945 F.2d 1057, 1059 (8th Cir. 1991) (internal quotation marks omitted) (quoting NLRB v. Walton Mfg. Co., 369 U.S. 404, 405 (1962). We must uphold the Board's decision if the record as a whole contains substantial evidence to support its factual findings. Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997).

Rather than applying the appropriate standard, acknowledging the Board's expertise, and considering both the no strike pledge and disparate treatment of striking employees by Nichols, the majority has substituted its own judgment for that of the Board. The Board's determination that Nichols violated the Act by terminating Bandy for his participation in the worker's strike is supported by substantial evidence, and its order should be enforced. I therefore dissent.

_____