MURPHY, Circuit Judge,
dissenting.
Because substantial evidence in the record shows that Nichols Aluminum (Nichols) violated Sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act by terminating Bruce Bandy for engaging in the protected conduct of striking, I dissent. Record evidence of the company’s animus against striking includes an illegal use of a no strike pledge, disparate enforcement of its stated policy of zero tolerance of violence, and its discriminatory treatment of returning strikers. The Board concluded from such evidence that the General Counsel met his Wright Line burden to show that animus against the workers’ strike motivated the illegal termination of Bruce Bandy who participated on the picket line.
The Board was entitled to consider the Nichols no strike pledge as strong evidence of animus against the protected conduct of striking, conduct in which Bandy had participated. Nichols hired replacement workers during the strike and converted 100 of them to permanent status on April 4. When the union ended its strike, Nichols asked returning strikers to agree that they would be subject to discharge if they went “on strike again over the same dispute.” As the Board noted, this no strike pledge did not define the term “same dispute” at a time when negotiations on a new contract were still ongoing. Two of the three Board members stated they would have found the no strike pledge unlawful in itself had it been alleged as a separate violation of the Act, and it was “strong evidence of animus toward the protected conduct of striking.” To condition employment on a promise not to engage in protected activity has been found unlawful, see In re Pratt Towers, Inc., 338 N.L.R.B. 61, 64 (2002), and hostility toward a union is “a proper and highly significant factor for the Board to consider when assessing” whether particular conduct resulted from a discriminatory motive. Carleton Coll. v. NLRB, 230 F.3d 1075, 1078 (8th Cir.2000) (internal quotation marks omitted).
In addition to Nichols’ use of an unlawful no strike pledge, the Board also considered the company’s inconsistent application of its zero tolerance policy in favor of non strikers. Two incidents not mentioned by the majority are particularly relevant to the Board’s determination that Bandy was terminated for his participation in protected labor activity. Each of the incidents involved replacement workers who had not participated in the strike but who had engaged in similar or more severe conduct than Bandy’s gesture. Neither was terminated.
The first incident occurred on May 4, 2012, one week after Bandy’s termination. When returning striker Robert Schalk was clocking out, he saw replacement employee Craig Sulzberger grab himself in the crotch and yell ‘What the fuck are you looking at, you got a fucking problem?” Schalk left the building, but outside he was accosted by Sulzberger who asked him “if [he] thought he was pretty and what his fucking problem was.” While Schalk attempted to reach his car, Sulzberger stepped in front of him and continued to curse. Schalk suggested they talk to a supervisor, and Sulzberger responded “that would be fucking fine, let’s fucking do it.” When they spoke with supervisor Phil McBroom, he asked Schalk “What the fuck do you want me to do about it?” Schalk responded that he thought they were to report such incidents as part of the zero tolerance policy. McBroom told him he “should fucking grow up,” and if he were to do anything about it, he would fire *557 both men. After Schalk reported the incident to human resources and plant manager Bill Hebert, Hebert indicated they would investigate. Sulzberger was eventually written up for violating the policy, but he was not discharged. In October Schalk resigned, citing a hostile work environment.
In the second incident, replacement worker Sam Harroun made a verbal threat to another employee during a heated conversation about which department was to blame for allowing molten aluminum to cool. After a comment by Harroun was contradicted by another employee, Har-roun turned and said “I’m going to take you out back and beat your ass.” When a third employee interrupted that Harroun often slept on his shift, Harroun replied “well, you’re nothing but a little bitch.” A supervisor intervened, and the encounter ended. No further action was taken by supervisors in response to Harroun’s threat.
On appeal Nichols claims that Sulzber-ger and Harroun, the two comparators identified by the General Counsel, both engaged in conduct that was less severe than Bandy’s cut throat gesture. The record does not support this claim, however. Harroun, the sole neutral witness, told Nichols during the investigation that he had not perceived Bandy’s gesture to be “any threat at all,” and he testified that the gesture was commonly used around the plant to shut off or stop something. He had understood the motion to be a signal for Keith Braafhart to stop blaring the forklift’s horn. While Bandy denied making any threat, Harroun made an explicit verbal threat and Sulzberger cursed a coworker and physically blocked access to his car. Nevertheless, striker replacements Sulzberger and Harroun were not terminated while Bandy was.
Nichols’ treatment of an employee not named as a comparator, Mike McGolthlen, also shows preferential treatment of non strikers. Before the strike, McGolthlen brought a handgun to work which he cleaned and loaded with a clip of bullets. Although he made no explicit threats, a coworker was alarmed and reported him to supervisors. McGolthlen was fired under the company’s zero tolerance policy on January 13, 2012, but he was rehired as a replacement employee after the strike began, a mere one month later. This rehiring was evidence that Nichols overlooked even severe violations of its reported zero tolerance policy. Nichols raises two other instances in which it fired employees for violating the zero tolerance policy, but both situations involved explicit threats. Before the strike, plant manager Hebert fired employee Ed Fountain for verbally threatening to bring a baseball bat into the office to beat a female human resources representative. After the strike ended, Hebert discharged non striker Roosevelt Smith after he told his supervisor he had weapons in his vehicle and he intended to “shoot him in the gut.” The severity of these incidents distinguishes them from Bandy’s hand gesture, and neither shows Nichols consistently applied its policy.
Although the majority concludes that the Board improperly analyzed causation under the Wright Line framework, the General Counsel’s initial Wright Line burden is simply “to demonstrate that the employee was engaged in protected activity, that the employer knew of this protected activity; and that the termination was motivated by anti-union animus.” NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 783 (8th Cir.2013). The Board applied the proper Wright Line framework, and substantial evidence supports its conclusion that Nichols’ “animus toward the recently ended strike motivated [it] to discharge Bandy.”
*558 The Supreme Court has explained that our appellate review “may not displace the Board’s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.” United Exposition Serv. Co., Inc. v. NLRB, 945 F.2d 1057, 1059 (8th Cir.1991) (internal quotation marks omitted) (quoting NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962)). We must uphold the Board’s decision if the record as a whole contains substantial evidence to support its factual findings. Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir.1997).
Rather than applying the appropriate standard, acknowledging the Board’s expertise, and considering both the no strike pledge and disparate treatment of striking employees by Nichols, the majority has substituted its own judgment for that of the Board. The Board’s determination that Nichols violated the Act by terminating Bandy for his participation in the worker’s strike is supported by substantial evidence, and its order should be enforced. I therefore dissent.